**Joyce A. PHARES, Plaintiff–Appellant,**

v.

**Borje GUSTAFSSON, et al.,
Defendants–Appellees.**

No. 87–3055.

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1988.

Decided Sept. 16, 1988.

Clifton J. Mitchell, Jackson, Mitchell & Collier, Peoria, Ill., for plaintiff-appellant.

Michael J. Tague, Franklin, Flynn & Palmer, Champaign, Ill., for defendants-appellees.

Before WOOD, Jr. and FLAUM, Circuit Judges, and WILL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff Joyce A. Phares claims that the defendants, administrators of the University of Illinois College of Veterinary Medicine and Personnel Services Office, violated her first and fourteenth amendment rights. Phares presented her claims at a jury trial; after Phares had finished presenting her case, the district court directed a verdict for the defendants. Phares appeals the directed verdict.

## I. FACTUAL BACKGROUND

On November 5, 1967, Phares was hired as a Clerk Typist II in the medical records unit of the Small Animal Clinic of the University of Illinois College of Veterinary Medicine Teaching Hospital. Phares received two promotions while working at the Small Animal Clinic: on May 1, 1969, Phares was promoted to Clerk Typist III and, on November 14, 1976, Phares' position was reclassified from Clerk Typist III to Medical Records Technician. During the 1970's, a conflict developed between Phares and her supervisors. This conflict resulted in part from Phares' frustrated attempts to obtain a promotion to Medical Records Librarian. The main problem, however, was the difference of opinion between Phares and her supervisors regarding how the medical records unit should operate.

### A. Operation of the Medical Records Unit

Shortly after she was hired, Phares was assigned the duty of setting up a medical records program at the Small Animal Clinic. After receiving training at Michigan State University, Phares designed case summary forms, as well as other forms, and established a filing and indexing system.

Clinicians used the case summary forms developed by Phares. Clinicians would complete a case summary form for each patient, indicating the diagnosis, prognosis, operation, and vaccination. The clinicians would then sign the form and submit it to Phares for abstracting.

Phares' duties basically entailed abstracting the information provided to her by the clinicians.[1] Phares reviewed the forms for

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Phares' job also included other duties. In 1969, for example, Phares became the sole non-academic staff member of the Medical Records Committee. Between 1969 and 1971, Phares' duties expanded to include supervising and training employees, setting up a medical records program for the Large Animal Clinic, microfilming medical records, and attending annual meetings of the American Association of Veterinary Medical Records Librarians.

accuracy and completion, ensuring that all of the laboratory reports and other materials were included in the medical record. Phares then abstracted the information from the case summary forms. This involved assigning code numbers to the diagnoses, prognoses, vaccinations, operations, and other pertinent information. Phares used standard reference texts and other coding lists to determine the proper code number to be assigned to each item. For each medical record, Phares entered the appropriate code numbers onto an abstract form. Phares then submitted the abstract form for entry into a computerized data retrieval system. Ultimately, the recorded data was sent to the Veterinary Medical Data Program at Cornell University, which gathers medical data from various institutions of veterinary medicine.

During the 1970's, an ongoing dispute developed between the veterinary clinicians and Phares concerning what information was required on the medical record to make it complete. Phares testified at trial that at times the diagnosis listed on a case summary form would appear to her to be incomplete. For example, lab reports might be added to the medical record after the clinician had completed the case summary form. If Phares believed that the lab report might change the diagnosis, she would send the medical record back to the clinician for review. Likewise, a clinician might list a diagnosis generally rather than specifically; for example, the diagnosis might be listed as "cystitis" as opposed to "cystitis due to staphylococcus aureus." Rather than listing the code number for the general diagnosis on the abstract form, Phares sometimes returned the medical record to the clinician to determine whether a more specific diagnosis was appropriate. Many clinicians were unhappy with Phares' practice of returning the medical records to them for review. Because the records were sent to clinicians for review and were not promptly returned, a serious backlog was created in the medical records unit. In addition, difficulties arose in locating specific medical records because they were not in the appropriate files.

### B. Phares' Attempts to Obtain a Promotion

While a Clerk Typist III, Phares began her efforts to obtain a promotion to Medical Records Librarian. Phares took the civil service exam for the position of Medical Records Librarian I on June 20, 1974. On March 11, 1975, she requested the University of Illinois Personnel Services Office to reclassify her current position as Medical Records Librarian I. Dr. Erwin Small, head of the Teaching Hospital's Medical Records Committee, sent a letter to Phares on October 4, 1976, advising her that he would support her reclassification as Medical Records Technician, but not as Medical Records Librarian I. Phares subsequently was reclassified as a Medical Records Technician.

Phares repeatedly requested that her position be reclassified as Medical Records Librarian. In April 1981, responding to Phares' request, the Personnel Services Office audited Phares' position, concluding that the position should be reclassified as Medical Records Librarian I. In response to the audit, defendant H. William Tredway, hospital administrator for the Teaching Hospital, restructured Phares' job duties [2] so that she could maintain her position as Medical Records Technician.

In November 1981, Tredway announced that the Teaching Hospital had created the position of Medical Records Librarian I and invited Phares to submit her resume. Although Phares was interviewed by the Medical Records Committee, the Teaching Hospital eventually decided to forego filling the Medical Records Librarian I position.[3]

---

**2.** Tredway advised Phares that she would no longer be a member of the Medical Records Committee; she would no longer supervise medical records personnel; and she would no longer advise medical staff regarding the proper use of terminology.

**3.** Shortly after her interview, Phares learned that the Medical Records Committee was considering out-of-state candidates for the Medical Records Librarian I position. In October 1981, Phares had retaken the civil service exam for that position, receiving a score of 110. Her high

On August 24, 1982, Tredway informed Phares that the Teaching Hospital had created a Medical Records Librarian II position. Phares applied to take the civil service exam for the position, but was refused because the new position required applicants to be certified records technicians, which Phares was not. The Teaching Hospital ultimately hired defendant Betty Wagoner as a Medical Records Librarian II.

*C. Disciplinary Action*

Although the dispute between Phares and the clinicians arose during the 1970's, the backlog continued without the dispute being settled. In the late 1970's, however, there was a change in the hospital administration. Defendant Borje Gustafsson was appointed to head the College of Veterinary Medicine Department of Veterinary Clinical Medicine in 1978. Defendant Tredway became the Teaching Hospital's new hospital administrator in 1978. Defendant Brendan McKiernan became chairman of the Medical Records Committee in 1980. In addition, defendant Betty Wagoner joined the medical records unit as a Medical Records Librarian II in 1982. At the time these defendants achieved their respective positions, a backlog already existed in the medical records unit.

In January and February of 1981, Tredway sent memos to Phares regarding the backlog of medical records. On June 14, 1981, Gustafsson issued a departmental reprimand to Phares for her failure to follow previous directives and for the continuing backlog of medical records.

On December 6, 1982, Phares filed a formal grievance with Tredway, complaining of acts of harassment by Tredway and Wagoner. That same day, defendant McKiernan, chairman of the Medical Records Committee, notified Phares of a departmental meeting in which her job performance and work attitude would be discussed. The meeting was held on December 16, 1982. Phares, represented by counsel, was presented with a written list of the charges against her. Although Phares was asked to respond immediately at the meeting, she did not.[4] Following the December 16 meeting, Phares was given a ten-day suspension. Phares unsuccessfully appealed the suspension.

On May 20, 1983, Phares was notified that a departmental meeting would be held to discuss her job performance and possible further suspension. An initial meeting was held on June 2, 1983, at which Phares received a written copy of the charges against her. The meeting was continued so that Phares could prepare a response; the meeting reconvened on June 8, 1983. At each meeting, Phares was represented by counsel. Phares was subsequently suspended for twenty-one working days.

In July 1983, Phares asked for a leave of absence so that she could seek other employment within the University. Tredway refused to sign Phares' leave slip and insisted that she resign. Phares then signed a letter of resignation under protest.

## II. DISCUSSION

In reviewing the district court's grant of a motion for a directed verdict, we must consider all the evidence and all reasonable inferences in the light most favorable to Phares, the non-movant. Viewing the evidence in this light, we must uphold the district court's ruling unless we find that Phares presented sufficient evidence for the jury to return a verdict in her favor. *Smith v. Board of Educ.*, 853 F.2d 517, 518

---

score placed her at the top of the civil service register and, at that time, she was the only eligible Illinois candidate for the position. Nevertheless, in August 1982, the Medical Records Committee interviewed an Indiana resident, defendant Betty Wagoner, for the position. Phares subsequently filed a formal grievance with Tredway, challenging, among other things, the propriety of the Medical Records Committee's consideration of an out-of-state applicant. The Personnel Services Office later confirmed

Phares' opinion, informing Tredway that civil service regulations prohibited the hiring of an out-of-state candidate due to Phares' position on the civil service register. The Teaching Hospital subsequently decided not to fill the Medical Records Librarian I position.

4. Phares subsequently responded to the charges in writing.

n. 1 (7th Cir.1988); *North v. Madison Area Ass'n for Retarded Citizens–Developmental Centers Corp.*, 844 F.2d 401, 403 (7th Cir.1988).

### A. First Amendment Claims

Phares asserts that the defendants violated her first amendment rights to free speech and to petition the government for a redress of grievances. We find, as did the district court, that both claims are meritless.

### 1. Right to Free Speech

■ Public employees, like all other citizens, have a constitutional right to speak out on matters of public concern. *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Conner v. Reinhard*, 847 F.2d 384, 388–89 (7th Cir. 1988). That right, however, is not absolute. The Supreme Court requires courts to balance an employee's right to speak out on matters of public concern against the state's interest, as an employer, in effective and efficient public service. *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

In reviewing Phares' free speech claim, the first step is to consider whether her speech touched upon matters of public concern. *See Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. As the Supreme Court recognized in *Connick v. Myers*, first amendment protection is not limited to political speech; speech concerning private matters may also enjoy first amendment protection. *Id.* at 147, 103 S.Ct. at 1690. Nevertheless, the Court held that

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.*

Whether Phares spoke on a matter of public concern is a question of law which we must review *de novo*. *Id.* at 148 n. 7, 150 n. 10, 103 S.Ct. at 1690 n. 7, 1692 n. 10. To determine whether a matter of public concern was involved, we must consider the content, form, and context of Phares' speech, as revealed by the entire record. *Id.* at 147–48, 103 S.Ct. at 1690–91.

Phares asserts that her complaints regarding the proper method of abstracting medical records were a matter of public concern. It is difficult to understand how a dispute between the clinicians and a staff member of the medical records unit concerning the proper method of abstracting the medical records would be a matter of concern to the general public. Nevertheless, Phares claims that the content of her speech was clearly a matter of public concern because her chief objection was that the clinicians required her to expand upon their diagnoses in violation of Illinois law. In particular, Phares points to Illinois's Veterinary Medicine and Surgery Practice Act, which provides that a person practices veterinary medicine if she "[d]irectly or indirectly diagnoses ... [the] physical or mental condition of any animal or bird." Ill.Rev.Stat. ch. 111, ¶ 6903(1) (1981) (current version at Ill.Rev.Stat. ch. 111, ¶ 7003(E)(1) (1985)). Illinois law prohibits persons from practicing veterinary medicine without a license. *Id.* ¶ 6924 (current version at ¶¶ 7003(E)(2), 7005). Phares insists that the clinicians required her to expand upon their general diagnoses, so that in effect she was indirectly diagnosing the animals.

We do not find Phares' argument particularly persuasive. From our review of the entire record, it appears that Phares was not required to expand upon a general diagnosis. Instead, she was allowed to enter the numeric code for the clinician's general diagnosis, even if she thought a more specific code might be appropriate. If the diagnosis was completely missing or illegible, she was permitted to send the record back to the clinician for clarification. We further note that Phares testified that she never saw or evaluated any animals, she was not asked to make prognoses, and she never created any raw data to be added to

the medical record. Phares did not add anything to the medical record; she merely prepared the record for entry into a computerized index. Even if Phares assigned a more specific code to a clinician's general diagnosis, and noted the more specific diagnosis on the case summary form, we find it unlikely that an Illinois court would find that she had "indirectly diagnosed" the animal. For example, when publishing company employees add subject and topic numbers to published judicial opinions as an aid to indexing, those employees are not "indirectly" deciding cases.

Nevertheless, we must view the evidence and all reasonable inferences in the light most favorable to Phares. Therefore, we will assume that the content of Phares' speech, concerning her claims that she was required to indirectly diagnose animals contrary to Illinois law, was of some interest to the public. *Connick v. Myers*, however, also requires us to consider the context and form of her speech. 461 U.S. at 147–48, 103 S.Ct. at 1690–91. As we have explained, the *Connick* "test requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985) (emphasis in original). *Accord Hesse v. Bd. of Educ.*, 848 F.2d 748, 752 (7th Cir. 1988); *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987).

In *Callaway v. Hafeman*, a public school district employee complained that one of her supervisors was sexually harassing her. The employee limited her complaints to informal, oral statements that she intended to be completely confidential. In addition, her communications were made in the context of resolving her specific problem with her supervisor, rather than dealing generally with the issue of sexual harassment within the school district. As this court found, "[w]hile the content of [the employee's] communications touched upon an issue of public concern generally, she was not attempting to speak out as a citizen concerned with problems facing the school district; instead, she spoke as an employee attempting to resolve her private dilemma." 832 F.2d at 417. Therefore, we found that the context and form of the employee's speech indicated that the concern was personal, not public. *Id.*

As in *Callaway*, we believe that this case involves speech dealing with a personal employment matter, rather than a matter of public concern. Phares argues that her speech did involve a matter of public concern because she claimed that the procedures of the medical records unit violated Illinois law. In *Callaway*, however, the employee's speech concerning sexual discrimination was undeniably a matter of public concern. Nevertheless, we found that the employee in *Callaway* was merely interested in improving her own personal working conditions. This was evidenced by the confidential and informal complaints she made to her superiors.

The present case, like *Callaway*, is best characterized as one in which the employee merely wished to improve her personal working conditions. The context and form of Phares' speech in this case indicates that a personal matter was at issue. Phares aired her complaints through the University of Illinois's grievance procedures. Phares did not try to expose wrongdoing or inform the public of problems within the College of Veterinary Medicine; she "simply disagreed with certain internal decisions made by [her] immediate superiors." *Knapp v. Whitaker*, 757 F.2d 827, 840 (7th Cir.), *appeal dismissed and cert. denied*, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985). Phares did not like the way the medical records unit was run; instead, she wanted to implement her own ideas. The mere fact that Phares' criticisms tangentially raised issues of public concern cannot transform a purely private personnel matter into a matter of public concern. *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8 (speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest"); *Hesse*, 848 F.2d at 752; *Egger*

*v. Phillips,* 710 F.2d 292, 318 (7th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). Viewing the entire record in the light most favorable to Phares, we believe that the main thrust of Phares' speech was to "further some purely private interest," *Linhart,* 771 F.2d at 1010, and thus was not a matter of public concern. Therefore, Phares has not presented a first amendment claim. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690 ("if [the employee's speech] cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge").

### 2. Right to Petition the Government for Redress of Grievances

Phares also claims that she was retaliated against for engaging in her first amendment right to petition for a redress of grievances. In 1981, Phares sought an audit of her job in an attempt to have her position reclassified as Medical Records Librarian. In addition, Phares filed two formal grievances in 1982. The first, filed on August 10, charged Tredway with attempting to hinder the job audit that Phares had requested. In that grievance, Phares also charged Tredway with altering her accrued vacation time. Phares filed a second grievance on December 6, complaining of harassment by Tredway and Wagoner.

The first amendment guarantees "the right of the people ... to petition the Government for a redress of grievances." The Supreme Court has stated that "[t]he right to petition is cut from the same cloth as the other guarantees of [the first amendment]." *McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 2789, 86 L.Ed. 2d 384 (1985). Thus, we will analyze an alleged violation of the petition clause in the same manner as any other alleged violation of the right to engage in free speech. *Id.* at 485, 105 S.Ct. at 2791; *Day v. South Park Indep. School Dist.,* 768 F.2d 696, 701–03 (5th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986).

■ Clearly, Phares' request for an audit and the complaints contained in her grievances involved personal, not public, concerns. Phares argues that because Illinois taxpayers fund the University of Illinois, they are interested in whether civil service jobs are classified correctly, whether civil service employees receive all their accrued vacation time, and whether civil service employees are harassed by their supervisors. This line of reasoning would make every personnel dispute within a public institution a matter of first amendment concern. The Supreme Court, however, has firmly rejected such reasoning. *See Connick,* 461 U.S. at 146–47, 149, 103 S.Ct. at 1689–90, 1961; *Hesse,* 848 F.2d at 752.

In addition, even if the content of Phares' grievances involved a matter of public concern, we believe that the form and context of her complaints indicate that these were purely matters of personal interest. Phares sought a job audit, using internal University procedures, as a step toward obtaining a promotion. Phares did not claim that the civil service classification system in general was flawed, but merely that her individual position should be reclassified. This was certainly not a matter of public concern. Likewise, Phares' disputes over vacation time and on-the-job harassment, while of great personal concern, were not matters of public concern. Phares was not trying to invite public scrutiny of problems within the medical records unit. Instead, Phares' speech was solely concerned with problems that affected her position. The mere fact that Phares' complaints may have included criticism of the College of Veterinary Medicine "does not significantly alter the essentially private nature of the dispute." *Egger,* 710 F.2d at 318. Because this was a purely private personnel dispute, Phares has not stated a first amendment claim. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689; *see Yatvin v. Madison Metro. School Dist.,* 840 F.2d 412, 419 (7th Cir.1988).

### B. Fourteenth Amendment Claim

Finally, Phares claims that she was disciplined in violation of the fourteenth amendment due process clause. Phares' primary complaint seems to be that she was disci-

plined without cause, in violation of Illinois law. Of course, we cannot review the substantive outcome of the disciplinary hearings. Phares had ample opportunity to appeal the outcome, and she took advantage of some of those avenues of appeal.[5] Our review is limited to ensuring that the procedures afforded Phares comported with due process.

 The fourteenth amendment forbids a state from taking one's life, liberty or property without due process of law. Therefore, Phares must have a property or liberty interest to support her due process claim. Phares asserts that she had a property interest under the Illinois Civil Service Act. That law provides that "no employee shall be demoted, removed or discharged except for just cause." Ill.Rev.Stat. ch. 24½, ¶ 38b14 (1985). Thus, the Illinois statute granted Phares a property interest in her continued employment. *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1263 (7th Cir.1985) (construing Illinois law); *Powell v. Jones*, 56 Ill.2d 70, 305 N.E.2d 166 (1973). *See Board of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709–10, 33 L.Ed.2d 548 (1972).

Although Phares was not actually discharged, we construe her complaint to allege that she was constructively discharged. Even if we accept Phares' argument that she was constructively discharged, however, we believe that she received due process. In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court found that, before being discharged, a public employee who can be terminated only for cause is entitled to "oral or written notice of the charges against him, an explanation of the employ-

er's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S.Ct. at 1495. The Court explained that "the pretermination 'hearing,' though necessary, need not be elaborate. We have pointed out that '[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.'" *Id.* at 545, 105 S.Ct. at 1495 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)).

Viewing the evidence in the light most favorable to Phares, we find that the two disciplinary hearings she received prior to her two suspensions satisfied due process. She was given advance notice of the meetings. She attended both meetings with her attorney. The charges against her were presented to her in writing. At the first meeting, which resulted in a ten-day suspension, Phares asked to respond to the charges in writing. That request was denied, although she was invited to respond to the charges orally, which she refused to do. At the second meeting, Phares was granted a one-week continuance so that she could respond to the charges in writing, which she did. Finally, Phares had a multistep appeal process in which to challenge the findings of the original administrative hearings.[6] Phares does not point out any specific deficiencies in the administrative procedures. Therefore, we find that the notice, the opportunity to hear the charges against her and respond with the aid of counsel, and the elaborate appellate process provided to Phares satisfied due process. *See id.* 470 U.S. at 545–48, 105 S.Ct. at 1495–96; *Harrah Indep. School Dist. v. Martin*, 440 U.S. 194, 197–98, 99 S.Ct.

---

5. At trial, Toby Kahr, Director of Personnel Services for the University of Illinois's Urbana–Champaign campus at the time this suit arose, testified concerning the University's grievance procedures. An employee initiates the process by filing a grievance with her supervisor. If dissatisfied with the result, the employee can appeal to the head of her department. Next, the employee can appeal to the campus Director of Personnel Services. Finally, the employee can appeal to the Director of Personnel Services for the entire University. If the employee is still

not satisfied, she can request that the matter be submitted for arbitration.

Following her ten-day suspension, Phares unsuccessfully appealed the suspension through each level to the University of Illinois Director of Personnel Services. Although Phares indicated her desire to arbitrate the suspension, she apparently did not perfect her request for arbitration. The record is unclear as to whether Phares appealed her twenty-one day suspension.

6. *See supra* note 5.

1062, 1063–64, 59 L.Ed.2d 248 (1979) (per curiam); *Pesce v. J. Sterling Morton High School,* 830 F.2d 789, 793 (7th Cir.1987); *Patkus,* 769 F.2d at 1265.

### III. CONCLUSION

Phares may have had some legitimate concerns about the manner in which the medical records unit operated. In addressing the issue of employee criticism, however, the Supreme Court explained: "While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691.

For the foregoing reasons, the district court is

AFFIRMED.