**Kenneth D. COLBURN, Jr. and Robert M. Khoury, Plaintiffs–Appellants,**

v.

**TRUSTEES OF INDIANA UNIVERSITY, Glenn W. Irwin, Jr., Howard G. Schaller, et al., Defendants–Appellees.**

No. 91–2866.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1992.

Decided Aug. 27, 1992.

As Corrected Sept. 1, 1992.

Rehearing and Rehearing En Banc Denied Nov. 20, 1992.

Richard L. Darst (argued), Mantel, Cohen, Garelick, Reiswerg & Fishman, Indianapolis, Ind., for plaintiffs-appellants.

Gregory J. Utken, Hudnall A. Pfeiffer (argued), Baker & Daniels, Dorothy A. Frapwell, Office of the University, Counsel, Indianapolis, Ind., for defendants-appellees.

Before RIPPLE and MANION, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

Kenneth D. Colburn, Jr. and Robert M. Khoury were employed as faculty members at Indiana University. They filed suit against the Trustees of the University and various University officials alleging that they were denied promotion, reappointment and tenure in violation of their rights to free speech and due process under the First and Fourteenth Amendments, and that their employment contracts had been breached by the defendants. The district court granted the defendants' motion for summary judgment. We affirm.

I.

The district court has provided an extensive discussion of the facts in this case, 739 F.Supp. 1268 (S.D.Ind.1990), so we will give an abbreviated version here. Kenneth Colburn and Robert Khoury were both hired to teach in the Department of Sociology at Indiana University—Purdue University at Indianapolis (IUPUI) in 1979.[1] Colburn was initially hired as a lecturer for a one

---

* The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. Khoury was hired by the Columbus campus, which is under the supervision of IUPUI.

year "non-tenured/non-probationary peri-
od." After he completed the requirements
for his doctorate, he was reappointed as an
assistant professor for a one year "tenure
probationary period" beginning in 1980 and
was reappointed annually until the end of
the 1985–1986 academic year. Khoury was
appointed as an assistant professor for a
one year "tenure probationary period," and
he was also reappointed each year until he
resigned in August, 1985.

Both plaintiffs received and signed a doc-
ument titled "INDIANA UNIVERSI-
TY NOTICE OF TERMS OF INITIAL
APPOINTMENT" at the time of their
appointments. This document set out
the salary each would receive and the
beginning and ending dates for their
one year appointments. It also stated
as follows:

In accordance with the policy approved
by the Indiana University Board of
Trustees on October 27, 1972, persons
accepting offers which will result in the
recommendation of their name for initial
appointment to the University are to be
notified in writing of the terms of the
appointment, and of criteria and proce-
dures relating to reappointment and the
awarding of tenure. The appointee must
acknowledge in writing that the condi-
tions and terms of the initial appoint-
ment, as well as the criteria and proce-
dures for reappointment, and tenure, are
agreed to.

Above the candidate's signature line it stat-
ed:

I agree to the terms of this appointment
as indicated above. I have read and
agree to the criteria and procedures em-
ployed in recommendations and decisions
about reappointment and the awarding
of tenure at Indiana University and any
special procedures customarily employed
in the department, school, program, or
division of the University in which my
appointment is to be recommended.

The procedures relating to promotion,
tenure and reappointment recommenda-
tions are found in two handbooks, the IUP-
UI Faculty Handbook and the Indiana Uni-

versity Academic Handbook. These hand-
books identify the criteria for promotion,
which include teaching, research, creative
work and service. The handbooks state
that the criteria for promotion and for ten-
ure are "similar, but not identical" and that
"tenure ... is not conferred unless a facul-
ty member achieves or gives a strong
promise of achieving promotion in rank
within the University." They also provide
that subject to each handbook's provisions,
a full-time faculty member "shall have ten-
ure after a probationary period of not more
than seven years" and that tenure "shall
be granted to those faculty members ...
whose professional characteristics indicate
that they will continue to serve with dis-
tinction in their appointed roles." Regard-
ing reappointment, in addition to notice and
appeal provisions, the handbooks state that
faculty members "shall be advised in writ-
ing ... of the criteria and procedures em-
ployed in recommendations and decisions
about reappointment and the award of ten-
ure ..." and require each faculty member
to agree to these criteria and procedures in
writing.

Decisions relating to professional ad-
vancement begin at the department level,
in the department's primary committee,
and go through a series of review levels.
The Sociology Department's primary com-
mittee was also where Colburn and
Khoury's career problems began. There is
no dispute that the Sociology Department
was riddled with interpersonal conflict. At
the core of this conflict was Professor John
Liell, who was the Chairperson of the pri-
mary committee from 1983–1984. He was
also a central player in what the parties
have referred to as "The Group," or the
"them" faction, which was a majority fac-
tion in the department. This divisiveness
apparently started after Professor Liell ex-
changed insults with a fellow professor,
Colin Williams. The result was that other
department members took sides with one
or the other. Plaintiffs contend that the
groups were also separated based on mem-
bership and non-membership in the faculty
union.

Colburn and Khoury were aligned with the minority or "us" faction, along with Williams and two other faculty members, Sue Hammersmith and Brian Vargus. In March 1984, members of this group each individually requested the Executive Dean and Dean of Faculties, Howard Schaller, to hold an external review of the workings of the Sociology department's primary committee by the University Tenure Committee. Colburn sent a letter to Schaller asking for external review in which he expressed concern about the state of the department and his own professional future. Khoury similarly requested external review of the committee's activities noting that he was aware of and had been a party to problems within the committee.

In response to these letters, Schaller, along with William Plater, Dean of the School of Liberal Arts, urged the department to attempt to resolve its differences internally and deferred review of the primary committee. Joseph Taylor, an assistant to IUPUI Vice President Glenn Irwin, was appointed to meet with members of the department and solicit their viewpoints. Taylor proposed an interim structure for the department, which passed in a department vote. The "us" faction abstained because this group believed that the plan simply maintained the department's status quo. Colburn and Khoury, along with two members of their faction, sent a memorandum to the Department Chairperson Richard Hope in which they decried the "deplorable and intolerable [situation], especially for junior members of the department who face discrimination by the now unchallenged dominant group within because they are not members of this group."

A new primary committee was elected by a departmental vote in September, 1984. The committee included four members of "The Group"—a clear majority since the committee only consists of four tenured, and one non-tenured faculty members. The Chairperson of the committee was defendant, Professor Linda Hass.

After the election, Colburn and Khoury each nominated themselves for promotion.

The primary committee recommended against both requests. Each application went through the remaining stages of the University's review process and neither was given a promotion. In early 1985, the primary committee and Department Chairperson Hope also recommended that Colburn not be reappointed. The primary committee's recommendation noted, in part, that Colburn's "written and verbal comments to people outside the department have hurt the image of the Sociology faculty and undermined the integrity of the peer review process." Dean Plater also recommended against reappointment. On April 23, 1985, Colburn was notified in a letter from Vice President Irwin of the official decision not to reappoint him.

Khoury was reviewed for tenure, and received a favorable recommendation from the primary committee, but a negative recommendation from Hope. Ultimately, Schaller and Irwin recommended against tenure and informed Khoury about their recommendations in a letter, which was the last information he received about his tenure application. Khoury was also denied reappointment. He resigned on August 23, 1985, after refusing the University's offer of a one year terminal appointment.

Colburn brought a grievance before the Faculty Board of Review which he stated was in conjunction with Khoury, though Khoury apparently never filed a grievance on his own behalf. Colburn was given a hearing after which the Board recommended that the Sociology Department undergo a self-study and that Colburn be given a two year terminal appointment through the 1987–1988 academic year. The University instead offered Colburn a one year terminal appointment, which Colburn declined. Colburn's further appeals to the University's President and Board of Trustees were also unsuccessful.

On April 21, 1987, Colburn and Khoury filed the present case charging that the defendants had failed to promote, reappoint and grant them tenure in retaliation for their requests for external review of the

primary committee.[2] They alleged that they were terminated in violation of their rights under the First and Fourteenth Amendments, and that their employment contracts had been breached.

The district court granted the defendants' motion for summary judgment. The court found that the plaintiffs' rights to free speech had not been violated because their requests for review were not matters of public concern; that they did not have a property interest in not being denied promotion or tenure; and that the individual defendants were entitled to qualified immunity from both these claims as well as from their challenge to their non-reappointment.[3] The district court also rejected their breach of contract claims on the ground that their employment had not been terminated during the time their one year contracts were in effect. Finally, the court, in its first opinion, denied the defendants' motion on the reappointment claims stating that there was an issue of material fact as to whether there was a "mutually explicit understanding that reappointment would be granted during the probationary period if performance were satisfactory." 739 F.Supp. at 1293. However, after receiving additional briefing, the court concluded that Colburn and Khoury did not have a property interest in being reappointed because it found that they had conceded that "they [made] no claim of a de facto reappointment system at Indiana University." Slip. op. at 4.

We review the district court's grant of summary judgment de novo. *PPG Indus. Inc., v. Russell,* 887 F.2d 820, 823 (7th Cir.1989). The record must be viewed in the light most favorable to the non-moving parties. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Summary judgment is proper if there is no dispute as to material facts, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).[4]

## II.

Colburn and Khoury argue that their requests for external review of the Sociology Department's primary committee constituted speech which is protected under the First Amendment, and therefore could not have been a basis for denying them reappointment or tenure. Public employees may not be forced to give up their First Amendment rights as a condition of public employment, *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), though not all employee speech is subject to constitutional scrutiny. Only speech which may be "fairly characterized as constituting speech on a matter of public concern" is protected, *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), and the district court concluded that the plaintiffs' request for review failed to meet this threshold requirement.[5] Though this issue is tied closely to the specific facts of a given case, whether speech touches on a matter of public concern is a question of law for the district court to resolve. *Phares v. Gustafsson,* 856 F.2d 1003, 1007 (7th Cir.1988).

Determining whether an employee's speech is a matter of public concern requires us to consider if the speaker is speaking more like a citizen or a disgruntled employee whose statements are primarily of personal interest. *Connick,* 461

**2.** They have now abandoned their claims with regard to the defendants' failure to promote them.

**3.** Plaintiffs conceded in the district court that they were limited to seeking injunctive relief against the Trustees of the University or University officials in their official capacity. 739 F.Supp. at 1281.

**4.** Because we agree with the district court's principal holdings that there were no constitutional violations, we do not reach the issue of whether the defendants are entitled to immunity.

**5.** *Connick* sets out a two part test to determine if employee speech is constitutionally protected. First, we must determine if the speech is on a matter of public concern, and second the employee's interest must be weighed against the public employer's interest in maintaining the effective operation of the workplace. Because we conclude that the plaintiffs' speech does not constitute a matter of public concern, we do not reach part two of this inquiry.

U.S. at 147, 103 S.Ct. at 1690. This distinction is "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. In the present case, the employee speech was in the form of letters addressed to University officials. The letters requested an examination of the review process within the Department of Sociology by another committee within the University. The requests were made in the context of a faculty feud. Plaintiffs alleged that the Sociology Department was so divided that individuals' careers, and the effective functioning of the department, were being threatened. Given these facts, we agree with the district court that plaintiffs' statements are not properly characterized as matters of public concern.

■ Plaintiffs contend that their letters were not simply an internal matter, but revealed that the integrity of the University was being threatened. Exposing wrongdoing within a public entity may be a matter of public concern. *See, e.g., Breuer v. Hart,* 909 F.2d 1035, 1039 (7th Cir.1990) (Plaintiff's allegations that sheriff breached the public trust by stealing county property). However, the record shows that although members of the Sociology Department may have "done wrong" in the sense they had evaluated professors based on their personal affiliations, plaintiffs' letters were principally an attempt to seek intervention in a clash of hostile personalities. No doubt the public would be displeased to learn that faculty members at a public university were evaluating their colleagues based on personal biases. Nonetheless, the fact that the issue could be "interesting" to the community does not make it an issue of public concern. Plaintiffs' statements revealed that individual biases within the Sociology Department's peer review process may have been present to excess, but they did not attempt to expose some malfeasance that would directly affect the community at large. *Cf., e.g., Knapp v. Whitaker,* 757 F.2d 827, 842 (7th Cir.), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985) (Employee's speech regarding the ineffectiveness of the school's grievance procedure in the midst of ongoing collective bargaining negotiations, inequitable mileage allowances for coaches and inadequate liability insurance are matters of public concern when they "could very well have a direct financial impact upon the entire taxpaying community.").

■ Plaintiffs take their argument one step further and contend that the division in the department fell along the lines of membership and non-membership in the faculty union, and that pressures to join a union make the faculty clashes of deep public concern. Speech which is related to collective activity may be a matter of public concern. *See,* for example, *Wulf v. City of Wichita,* 883 F.2d 842 (10th Cir.1989) (letter to Attorney General alleging interference with rights of police officer to join union is a matter of public concern); *American Postal Workers Union v. United States Postal Service,* 830 F.2d 294 (D.C.Cir.1987) (employee's article in union newsletter opposing "right to work" laws). But neither plaintiff's letter stated that they believed that they were receiving undue pressure to join the union. Another faculty member, Professor Hammersmith, did contend in her letter to Schaller that some members of the Sociology department felt pressure from a senior faculty member to join the faculty union in order to receive favorable evaluations. In their affidavits, Colburn and Khoury also state that Professor Liell had encouraged them to join the union as a quid pro quo for a favorable review. However, neither told Schaller that they believed they were treated adversely because of their stance on union membership. Although union affiliation may have been a factor in determining membership in one of the two competing groups, pressure to join the union was not the central reason for the request for review of the department, nor were Colburn and Khoury attempting to inform the public that faculty members were being pushed into union membership.

Plaintiffs' motivation in seeking review of the department, while not dispositive of their First Amendment claims, is relevant to assessing the character of their statements. *Hesse v. Board of Education,* 848

F.2d 748, 752 (7th Cir.1988), *cert. denied,* 489 U.S. 1015, 109 S.Ct. 1128, 103 L.Ed.2d 190 (1989); *Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987). Though both voiced concern about the functioning of the Sociology Department, the point of their speech, given the context in which the letters were written, was to highlight how the department's infighting had affected them and would affect their futures at the University.

In his letter to Schaller, Colburn stated that he had "deep concern for [his] . . . own personal and professional well-being" and that hostility in the department had "destructive effects" on "junior, nontenured members of the department such as [himself]. . . ." Khoury's letter, though briefer and less personal than Colburn's, does note that he had "been a party to" problems caused by the committee. Both letters must be considered in light of the fact that Colburn and Khoury were annually subject to peer review by the primary committee.

■ Plaintiffs assert that simply because they had some personal interest in calming the tensions in the department does not prevent their requests for review from being matters of public concern, and they suggest that in fact their letters were contrary to their own interests since the letters could have been, and they argue were, a basis for retaliation against them. Speech is not unprotected simply because it raises complaints or other issues personal to the speaker. *Biggs v. Village of Dupo,* 892 F.2d 1298, 1302 (7th Cir.1990). Many public employees who speak out about conduct within their places of employment have some interest in the institution of change, and this by itself would not prevent their speech from being constitutionally protected. *See Breuer v. Hart,* 909 F.2d at 1039 ("Wrongdoing may often be revealed to the proper authorities only by those who have some personal stake in exposing wrongdoing."). However, where the overriding reason for the speech is the concerns of a few individuals whose careers may be on the line, the speech looks much more like an internal personal dispute than an effort to make the public aware of wrongdoing.

The record demonstrates that neither plaintiff's goal was to bring the hostility in the department to light because he believed it was of significance to the community. Moreover, the fact that Colburn and Khoury were taking a risk by writing the letters does not suggest that they were not, nonetheless, motivated primarily by the hope that their efforts would be of benefit to them.

Plaintiffs also emphasize that they did not speak simply to further their own career interests, but everyone in the department's interest. Evidence that other faculty members viewed the department's infighting with great concern is relevant to whether their speech is properly viewed as a matter of public concern. *See Gray v. Lacke,* 885 F.2d 399, 413 (7th Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990) (complaint filed on behalf of others "is an indication of public, rather than private, concern"). However, the Sociology Department's deterioration was principally of importance to the few faculty members who had to tolerate the bickering. When, as *Connick* directs, the content and context of the statements are considered, they are much more akin to an effort to resolve an internal squabble than to statements by individuals speaking out as citizens. *Cf. Knapp,* 757 F.2d at 841 (noting that functioning of grievance procedure is generally "important only to . . . employees who use the procedure. . . .").

Finally, the forum in which Colburn and Khoury raised their concerns is relevant to whether their statements should be characterized as a matter of public concern. *See Barkoo v. Melby,* 901 F.2d 613, 618 (7th Cir.1990) ("The speaker's motivation and choice of forum are important because, absent those factors, every employment dispute involving a public agency could be considered a matter of public concern."). Plaintiffs emphasize that their speech was a request for "external" review. Their concerns, however, were not aired in a community or other public forum but in a forum internal to the University—letters to

University officials. Employee speech does not go unprotected simply because the chosen forum is private and addressed solely to others in the workplace. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 414, 99 S.Ct. 693, 695–96, 58 L.Ed.2d 619 (1977). *Cf. Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (Employee's off-hand remark to coworker about attempt on life of the President protected speech). But statements made privately in the workplace themselves must be of some public concern in order to be protected under the First Amendment. Colburn's and Khoury's requests for review are expressions of personal concern about a clash of personalities in the Sociology Department, which when chosen to be articulated solely to a few university officials, underscores the internal nature of the dispute. *Cf. Phares*, 856 F.2d at 1008 (Speech not public concern when complaints aired through university grievance procedures with no attempt to inform the public about the problems complained of). Plaintiffs note that they were following University procedure by bringing the problems to light within the University hierarchy. That may be so, but this does not render the manner in which they spoke out irrelevant to the public concern inquiry.

Viewing the record as a whole, we agree with the district court that the circumstances surrounding the plaintiffs' letter writing suggest that their statements are most reasonably characterized as relating to matters of personal interest. Plaintiffs were not speaking primarily as citizens, but as faculty members concerned about the private matter of the processes by which they were evaluated. That is not to say that we believe that the behavior of the various faculty members was unimportant to those involved, or that the plaintiffs were unjustified in expressing concerns about their careers. Apparently they had

good reason to be concerned given the mounting hostility in the department.[6] That Colburn and Khoury may have been treated unfairly, however, does not compel a finding that their statements were of public concern. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90; *Callaway*, 832 F.2d at 416. The lack of impartiality on the primary committee was the product of conflicting personalities—there was no illegality or breach of the public trust involved. Given the form, content and context of the speech, we find that it is not a matter of public concern.

■ Plaintiffs also raise a second First Amendment claim. They contend that during the time they were denied reappointment and tenure they "spoke out" about misconduct by the Recorder of the School of Liberal Arts. The School's Recorder was fired after it was discovered that there were errors in student records affecting graduation dates, but despite her poor work performance, she was later rehired as a secretary. The alleged protected speech was plaintiffs' request for a copy of the Recorder's personnel file.

It is not surprising that the district court's detailed opinion does not address this issue because, while in their amended complaint plaintiffs do allege that they were discharged for requesting information about the Recorder, they did not argue this as a basis for their First Amendment claims in response to the defendants' motion for summary judgment.[7] In general, we will not consider an argument which is presented for the first time on appeal. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir.1986). However, while the defendants note that the plaintiffs did not make this argument to the district court, they do not contend that the First Amendment claims have been waived, and therefore have waived arguing waiver of this claim. *McKnight v. General Motors*

---

6. Tensions between Professor Liell and Professor Colburn reached such an extreme that Liell, who lived next door to Colburn, hung a naked "Ken" doll, with pins in its head and groin, by a rope around its neck facing Colburn's house. It is unclear from the record exactly when this took place.

7. Colburn and Khoury made a single reference to the Recorder issue in their response to the defendants' motion for summary judgment in which they stated that they "spoke out about ... wrongdoing such as ... the awarding of unearned diplomas by the Recorder." R. 21 p. 3.

*Corp.*, 908 F.2d 104, 108 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991). This matters little, because the argument fails on the merits.

Malfeasance by a University employee which could result in students receiving unearned degrees is a serious issue. But Colburn and Khoury were not attempting to spark debate or inform the public about the Recorder's misconduct; they were trying to obtain ammunition for their fight to retain their own jobs. They each testified at their depositions that the request for the Recorder's personnel file was made by their attorneys on a list submitted to the University at a meeting with Deans Plater and Schaller. Khoury testified that they needed the Recorder's personnel file to challenge their tenure and promotion decisions by comparing their performance and treatment to that of the Recorder. Their amended complaint similarly contrasts the performance of this "bad" employee with that of the plaintiffs.

Plaintiffs have not alleged that their First Amendment rights to receive information were tampered with. Their argument is that by requesting information about the Recorder they spoke on a matter of public concern and that the University, not wanting the word spread about this issue, retaliated against them. This request was not speech entitled to constitutional protection, but a mere extension of plaintiffs' private personnel disputes.

### III.

■ Plaintiffs next argue that they were denied due process when their employment was terminated. The Fourteenth Amendment's due process guarantee applies to public employees who have a "property interest" in the terms or conditions of their employment. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). That interest is established "by existing rules or understandings that stem from an independent source such as state law—rules and understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. Thus, for example, an employee whose terms of employment include a "for cause" type provision may not be terminated without adequate procedural protection. *See Farmer v. Lane,* 864 F.2d 473, 480 (7th Cir.1988). A property interest is also made out by a showing of a de facto re-employment or tenure system such as where there are "mutually explicit understandings" which include a promise of continued employment. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

Plaintiffs contend that they had a protectable "property interest" in their continued employment based on the University's handbooks and their own appointment contracts. Specifically, they rely on the provisions of these documents which provide that a faculty member must be notified of and agree to the "criteria and procedures employed in recommendations and decisions about reappointment and tenure." The gist of their argument is that when there is an agreement to "criteria and procedures" in conjunction with employment decisions such as tenure and reappointment, this entitles the employee to due process. We disagree.

A property interest is not established by general statements in handbooks, appointment documents or elsewhere that an employee will be judged based on some "criteria." As the First Circuit has found, "[b]y specifying in writing the usual criteria for promotion—teaching, scholarship, service— a university does not thereby set objective criteria, constricting its traditional discretion or transforming a largely judgmental decisional process into an automatic right." *Lovelace v. Southeastern Massachusetts University,* 793 F.2d 419, 422 (1st Cir. 1986). *See also Hohmeier v. Leyden Community High Schools,* 954 F.2d 461, 465 (7th Cir.1992) ("A rule or regulation, even if it contains substantive criteria, must have 'binding force' in order to create constitutionally protected property.").

Property interests exist when an employer's discretion is clearly limited so that the employee cannot be denied employment unless specific conditions are met. *Wallace v. Robinson,* 940 F.2d 243, 247 (7th Cir.

1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1563, 118 L.Ed.2d 210 (1992) ("Due process comes into play when substantive rules limit the reasons that support action."). There were no such limits on the defendants' decision-making related to plaintiffs' continued employment.

Regarding tenure, the handbooks state that the criteria for tenure are similar to those for promotion, which include teaching, research, creative work and service. These criteria are inherently subjective leaving a wide range of discretion in evaluating a faculty member's record. Moreover, the handbooks' provision that a faculty member "shall have tenure after a probationary period of not more than seven years" does not mean that tenure is automatically awarded at the end of seven years; the probationary faculty member is still subject to favorable peer review.

It is not surprising that courts have regularly refused to find that a probationary faculty member has a property interest in receiving tenure since implying an absolute right to tenure would be inconsistent with the existence of a formalized tenure process. *See, e.g., Haimowitz v. University of Nevada,* 579 F.2d 526, 528 (9th Cir. 1978) ("[T]he existence of a formal code governing the granting of tenure precludes a reasonable expectation of continued employment absent extraordinary circumstances."); *Beitzell v. Jeffery,* 643 F.2d 870, 877 (1st Cir.1981) ("In the absence of unusual circumstances, where a formal tenure system exists, that system confers no 'property' interest on probationary employees."). Moreover, if there was a guaranteed right to tenure, then a tenure award would have no effect on a faculty member's status. *See Staheli v. University of Mississippi,* 854 F.2d 121, 124 (5th Cir. 1988) ("[T]he very existence of a tenure system means that those teachers without tenure are *not* assured of continuing employment.").

IUPUI's reappointment provisions are even more imprecise than those related to tenure decisions. Under the heading "Criteria for Reappointment" the handbooks simply state that faculty members will be advised of the criteria for reappointment, without specifying any such criteria or otherwise stating that reappointment is guaranteed under any circumstances. Once again, there is no mandatory language in the contracts or in other University documents restricting the defendants' discretion in denying reappointment. Nor did the decision to reappoint Khoury and Colburn under a series of one year contracts bind the University to continue the rehiring process. *See, e.g., Valentine v. Joliet Township High School District,* 802 F.2d 981, 985 (7th Cir.1986); *Eichman v. Indiana State University,* 597 F.2d 1104, 1109 (7th Cir.1979).

The distinction the handbooks draw between non-reappointment and dismissal is instructive here. A faculty member who is "dismissed" has his or her employment terminated "prior to the expiration of their term of appointment." Dismissal may only occur for "(a) incompetence, (b) serious or professional misconduct, or (c) extraordinary financial exigencies of the University." The type of specific conditions necessary for dismissing a faculty member are noticeably absent from the University's non-reappointment "criteria."

It was not sufficient to create a property interest for plaintiffs to be assured that they would be judged by "criteria" established by the University. They contend that given this promise, they could not be denied employment for reasons outside the criteria. Regarding reappointment, there were no identified criteria. The criteria for tenure do not exclude any other basis for evaluating an employee, and as discussed previously, the criteria themselves allow for wide discretion. Plaintiffs correctly assert that they could not be refused employment for a reason entitled to constitutional protection. But that is irrelevant to the issue of whether they have an established property interest. There is no guarantee in the handbooks or appointment documents that either plaintiff could not be denied reappointment or tenure except under specific circumstances.

■ Colburn and Khoury also argue that the district court improperly granted sum-

mary judgment on the issue of whether there were mutual understandings which established a de facto guarantee of continued employment. The district court concluded in its initial opinion that there was potentially a factual dispute as to whether there was a custom of automatic reappointment. Then, in further briefing, the plaintiffs argued the following:

Plaintiffs do not claim a de facto tenure system contrary to the written tenure system.... Nor do plaintiffs claim that every professor is entitled to reappointment, tenure or promotion. Plaintiffs only claim that defendants must follow the contract and provide the contract rights.

The district court found that they had thereby conceded that there was no basis for finding a property interest outside the University's written procedures and, having already concluded that there were not written provisions establishing a property interest, granted summary judgment on the defendants' remaining claim.

Plaintiffs assert that the district court erred by failing to allow them to present evidence of conversations which were consistent with the written documents instead of contrary to them. They contend, in effect, that the court turned the parol evidence rule on its head by concluding, as they describe, that if there are no understandings or customs that were inconsistent with the written documents then no extrinsic evidence could be presented to a jury. Plaintiffs misconstrue the district court's opinion.

The court's decision was not based on the application of the parole evidence rule. The district court properly found that there was nothing in the written employment system which gave Colburn or Khoury a property interest in their employment. Therefore, in order to have a de facto reappointment system, in other words a guarantee of continued employment based on some understanding, custom or practice, this system would need to be contrary to the written policy in the sense that it would provide guaranteed reappointment. The district court concluded that the plaintiffs,

by stating that there was no de facto tenure "contrary" to the University's written policies, had admitted that they were relying solely on the University's written policy in support of their due process claims.

Plaintiffs argue that the district court should have examined their own affidavits, and that of a former Executive Dean, Edward Carter Moore, which were submitted with their supplemental brief. But their contention in the district court, and apparently in this court (since their argument consists of quotes from their district court brief) is that these documents amount to a confirmation that the "criteria and procedures" already contained in the written employment documents should be followed—writings which contain no mandatory criteria which apply to reappointment decisions. Because plaintiffs have not alleged that there is any right to reappointment beyond following the criteria and procedures in the University's written policy, they have failed to support a claim that there was a de facto tenure system in place which entitled them to reappointment.

Moreover, even if they have made an unintended concession, it is not clear the affidavits would support a claim of a de facto reappointment system. In his affidavit, Colburn states, "During my initial job interview with the Chairperson of the IUP-UI Department of Sociology, Brian Vargus ... I was told by him that there was no question that I would be reappointed annually so long as I performed satisfactorily in the three areas of teaching, research and service." He also states that he received the same assurances on several occasions from various University officials, including Deans and different chairs of the Sociology Department's primary committee.

Khoury's affidavit similarly states that when he met with Chairperson Vargus, "he explained ... that I would be reappointed if I had satisfactory performance in the three areas of job performance—teaching, research and service...." According to Khoury, other University officials repeated that he would be reappointed if he met these criteria.

Plaintiffs have presented no arguments in support of a finding that the assurances they received entitled them to notice and a hearing prior to being denied reappointment. We note, however, that the relevant authority is overwhelming that repeated assurances that a faculty member is "on the right track" or "will certainly be retained if his performance is satisfactory" do not create an enforceable property interest. *See, e.g., McElearney v. University of Illinois*, 612 F.2d 285, 290 (7th Cir.1979) ("[A]gainst the background of formal, explicit rules governing ... tenure" assurances from department head that a faculty member will receive tenure "do not create a property interest in employment."); *Upadhya v. Langenberg*, 834 F.2d 661, 665 (7th Cir.1987), *cert. denied*, 486 U.S. 1033, 108 S.Ct. 2016, 100 L.Ed.2d 603 (1988) ("[V]ague statements ...—no doubt accurate depictions of the practices—do not transmute probabilities into entitlements."); *Lovelace*, 793 F.2d at 423 ("[W]hen there is a written system ... it generally will not be reasonable ... to rely on employment assurances made outside of the formalized system."); *Staheli*, 854 F.2d at 125 ("[W]hen the state provides an explicit and formal policy governing entitlement to a job, informal and customary understandings do not create a property interest ..."). Cases to the contrary are few, and involve facts where promises by an employer are clearly made by those with authority to guarantee continued employment. *See, e.g., Perry v. Sindermann, supra*, (University lacked formal tenure system but official policy stated that "a faculty member [should] feel that he has permanent tenure as long as his services are satisfactory"); *Vail v. Board of Education*, 706 F.2d 1435 (7th Cir.1983), *aff'd.*, 464 U.S. 813, 104 S.Ct. 66, 78 L.Ed.2d 81 (1984) (Board of Education voted in a special session to hire plaintiff for two years).

In addition to the evidence of their own expectations, plaintiffs also submitted to the district court the affidavit of a former Dean, Edward Carter Moore. Moore's affidavit states that there was a mutually explicit understanding that reappointment would occur if a faculty member's performance was satisfactory. He specifically notes that "in my capacity as Dean of Faculties, I assured dozens of faculty that reappointment depended upon their getting satisfactory performance reviews during the first five years of service."

A single professor's belief that reappointment occurs as a matter of course does not establish that this was an official University policy. The University itself must enter into an agreement to create a property interest. *Staheli*, 854 F.2d at 121. Numerous IUPUI officials review reappointment recommendations and the decision is not in the sole control of any individual Dean or Chairperson who may have given plaintiffs assurances of their continued employment—each had authority only to make recommendations. *Cf. Hadley v. County of DuPage*, 715 F.2d 1238, 1242 (7th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984) (assurances by persons without authority to bind an employer do not create a property interest).

Given that there was a formal reappointment system, where employees were subject to annual review and were given appointment contracts which expired on a yearly basis, it is unlikely that Colburn and Khoury could have reasonably relied on the assurances they received as guarantees of their continued future employment at the University. We need not decide this question, however, because the plaintiffs have failed to argue that there was any reappointment system beyond the criteria and procedures in the University documents, and nothing in these documents gave them a property interest entitling them to a hearing prior to having their employment terminated.

In sum, because plaintiffs did not have a property interest in being re-employed following the expiration of their appointment contracts or to be granted tenure, we do not consider the adequacy of the procedures utilized by the University in deciding to terminate their employment. Because there was no property interest to protect, summary judgment for the defendants on this claim was proper.

**593**

## IV.

Colburn and Khoury raise, as a final argument, that the district court erred in granting summary judgment on their pendant state law contract claims. The district court found that these claims failed because plaintiffs' discharges were only effective after their one year appointments had expired.

Plaintiffs' argument in their opening brief in this court on this point is, in total, as follows:

> The district court did not consider each contract violation alleged by plaintiffs. The district court implied that simply because the one "aspect of their contract" that plaintiffs not be discharged within one year was fulfilled, the jury could not consider the evidence of contract violations. [citation omitted]. Plaintiffs did not allege that the discharge provision was violated. Plaintiffs are entitled to have the jury consider the extrinsic evidence and decide whether the provisions were violated which plaintiffs claim were violated. [citation omitted].
>
> It is a fundamental rule of law that all parts of a contract shall be given effect, if it can reasonably be done. [citations omitted].

 Such a perfunctory argument does not preserve a claim in this court. Plaintiffs have failed to inform us of a legal or factual basis for their contract claims. If, as we must assume, they are contending that various procedures or rules of the University were incorporated into their appointment documents and these were somehow violated, they cannot leave it to this court to scour the record in search of factual or legal support for this claim. *See, e.g., Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs, Benefits Review Board,* 957 F.2d 302, 305 (7th Cir.1992) ("[W]e have no obligation to consider an issue that is merely raised, but not developed, in a party's brief."); *United States v. Haddon,* 927 F.2d 942, 956 (7th Cir.1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim."). The claims are waived.[8]

### Conclusion

The district court's grant of summary judgment in favor of the defendants is AFFIRMED.

---

8. In their reply brief, plaintiffs state that they argued to the district court that the "'criteria and procedures for reappointment and tenure' had not been complied with by the defendants." They also state that in their affidavits they "detailed the provisions of their contracts that were not complied with," and then proceed to list several alleged violations of University procedures. For several reasons, we will not consider these arguments. First, claims are not "preserved by references to documents filed in the district court." *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1430 (7th Cir.1986). More significantly, arguments cannot be presented for the first time in a party's reply brief. *Secon Service Systems, Inc. v. St. Joseph Bank & Trust Co.,* 855 F.2d 406, 411–12 (7th Cir.1988). Finally, simply referencing a list of alleged violations of University procedures is not a developed argument in support of a breach of contract claim which permits appellate review. *Hunter,* 797 F.2d at 1430 ("Issues must be argued to be preserved.").