832 F.2d 414
 45 Fair Empl.Prac.Cas. 154,
45 Empl. Prac. Dec. P 37,716, 56 USLW 2266,
42 Ed. Law Rep. 723,
2 Indiv.Empl.Rts.Cas. 1093
 Franzetta CALLAWAY, Plaintiff-Appellant,
v.
Donald HAFEMAN, Clarence Sherrod, Herman Moody, Jr., Kwame
Salter, Barbara Arnold, Anne Arnesen, Richard
Berg, Nicki Smith, Nancy Brien and
Madison Metropolitan School
District,
Defendants-
Appellees.
 No. 86-2324.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 10, 1987.
Decided Oct. 27, 1987.
 
 Daphne Webb, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiff-appellant.
 Bruce M. Davey, Lawton & Cates, S.C., Steven J. Schooler, Brynelson, Herrick Bucaida, Dorschell & Armstrong, Madison, Wis., for defendants-appellees.
 Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.
 BAUER, Chief Judge.
 
 
 1
 The plaintiff-appellant, Franzetta Callaway, appeals the district court's dismissal of her first amendment complaint on the defendants' motions for summary judgment, 628 F.Supp. 1478. For the reasons that follow, we affirm the district court's order granting the defendants' motions.
 
 I.
 
 2
 Until July 1, 1985, plaintiff Franzetta Callaway served the Madison (Wisconsin) Metropolitan School District as an Affirmative Action Officer and as a Human Relations Coordinator.[1] In the latter capacity, her supervisor was defendant Herman Moody, Jr., who was the Human Relations Director for the School District. In her capacity as an affirmative action officer, plaintiff reported directly to the School District's superintendent, defendant Donald Hafeman. Plaintiff had held these positions since her initial hiring in November, 1980. Moody assumed his responsibilities as Human Relations Director in July, 1983, although he had previously held other positions with the School District.
 
 
 3
 Beginning in January, 1983, and intensifying after July 1, 1983, Moody allegedly engaged in sexual harassment of the plaintiff. Such harassment took the form of an attempt to kiss the plaintiff, numerous propositions to meet after work or at out-of-town conferences, and suggestive remarks or conduct. These advances were uninvited and discouraged.
 
 
 4
 Plaintiff complained of this sexual harassment to defendant Salter in December, 1983, and again in May or June, 1984. She also reported the harassment to defendant Hafeman and defendant Clarence Sherrod, the School District's legal counsel, in June or July, 1984.
 
 
 5
 Plaintiff's complaints of the sexual harassment by Dr. Moody were oral and informal. She explains that she did not want to make a public issue of the allegations which she viewed as personal and confidential. A performance evaluation of plaintiff prepared in May, 1984 by Moody was, in plaintiff's view, negative in tone and motivated by her reporting of the sexual harassment. Although Moody denied plaintiff's allegations, a meeting was held with Superintendent Hafeman to resolve the grievance. Moody was advised that if such behavior had occurred it should cease, and that the situation between the two would be monitored. Plaintiff was dissatisfied that she was not transferred from under Moody's supervision, although this dissatisfaction was relayed only to her attorney.
 
 
 6
 Thereafter Moody allegedly subjected the plaintiff to retaliation by creating a hostile work environment. Plaintiff reported this fact to Hafeman, who allegedly did nothing. As late as June, 1985, plaintiff was still attempting to resolve her dispute with Moody privately and informally.
 
 
 7
 During the period that plaintiff was being subjected to retaliation and before this lawsuit was filed (June, 1984 through June, 1985), a plan to reorganize human relations and affirmative action programs was formulated by Moody, at Hafeman's delegation. Hafeman modified Moody's initial proposal which was submitted in December, 1984, and then presented it to the Board. After additional modifications the plan was implemented in July, 1985. The reorganization resulted in plaintiff being reassigned as an administrative assistant in the Human Relations Department, under Moody. Moody assumed the plaintiff's affirmative action duties while her duties relative to Title IX were assigned to another person. Plaintiff was transferred to an office at Lincoln School, where she was the only administrative staff person present. She considers her new assignment to be a de facto demotion. Plaintiff was openly and publicily critical of the reorganization plan.II.
 
 
 8
 The appellant does not allege discrimination based on sex. Rather, she confines her appeal to the issue of whether the first amendment protects a government employee who is allegedly retaliated against for making private complaints of sexual harassment. We begin by recognizing the right of all public employees to engage in free speech and self-expression while participating in political and social affairs. Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). In Connick, the Court outlined the constitutional underpinnings of the First Amendment's free speech provisions, stating that:
 
 
 9
 The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.
 
 
 10
 Id. 461 U.S. at 145, 103 S.Ct. at 1689 (citations omitted).
 
 
 11
 The correlation implicit in premising free speech on the need for promoting social and political change, however, is that speech that does not have such concerns as its goal will be afforded less protection generally, and specifically when viewed in the context of public employment cases. While our task continues to require a balancing of Callaway's right, as a citizen, to speak out on matters of public concern and the School District's interest as an employer, in efficiently performing its intended function, we will not become entangled in every employment dispute merely because allegations involving free speech arise. The Constitution simply does not guarantee public employment unsullied by the potential for silly and at times unjustified termination or transfers unless premised upon specific forbidden grounds. Thus, as the Connick court noted, if Callaway's complaints "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her [transfer]," id. at 146, 103 S.Ct. at 1690, even if such transfer is alleged to be mistaken or unreasonable. Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Perry, 408 U.S. at 597, 92 S.Ct. at 2697-98; Board of Regents v. Rosh, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
 
 
 12
 In Connick, the plaintiff-employee, Myer, had circulated a survey among her co-workers in the New Orleans District Attorney's Office following a proposal by her superior that she be transferred to a different section of the criminal court. The survey solicited responses pertaining to the confidence and trust which employees possessed in various supervisors, the level of office morale, the need for a grievance committee in the office, and the pressure employees felt to campaign on behalf of office-supported candidates. All but the last question related directly to Myer's personal grievance concerning her work transfer. Myer was subsequently terminated for insubordination which she alleged was a violation of her First Amendment right to free speech.
 
 
 13
 The Court indicated that Myer's questions were merely an attempt to "gather ammunition for another round of controversy with her superiors" and were not matters of public concern entitling her to First Amendment protections. However, the Court concluded that Myer's communication regarding political campaign work, which was unconnected with her immediate personal interest in opposing her own work transfer, involved a matter of public concern requiring application of the Pickering balancing test to determine whether that particular speech was protected. See Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (requires weighing of public employee's interest as a citizen against state's interest as an employer). Moreover, the Court distinguished Myer's speech relating to her transfer from another employee first amendment case in which the Court found the speech to be protected. See Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), where the employee spoke out as a "citizen on a matter of general concern, not tied to a personal employment dispute," thus leading the Court to conclude that the speech involved a matter of public concern. Connick, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8.
 
 
 14
 Hence, while it is undoubtedly true that incidences of sexual harassment in a public school district are inherently matters of public concern, the Connick "test requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" Linhart v. Glatfelter, 771 F.2d 1004, 1010 (7th Cir.1985); see also Yoggerst v. Stewart, 623 F.2d 35 (7th Cir.1980).
 
 
 15
 To make such a determination, this court must review Callaway's statements by evaluating the content, form, and context of her communications. Connick, 461 U.S. at 147, 103 S.Ct. at 1690; Brasslett v. Cota, 761 F.2d 827, 840 (1st Cir.1985); Knapp v. Whitaker, 757 F.2d 827, 838 (7th Cir.), cert. denied, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985). We agree with the district court that "[i]n this case, the context and form of the speech leads to the inescapable conclusion that ... [Callaway's] concern was personal, not public."
 
 
 16
 Prior to the commencement of this litigation, Callaway limited her complaints of sexual harassment to oral statements intended to be purely confidential. As Callaway explained in a meeting with several of the defendants, she wanted her grievance to be resolved internally to avoid a public controversy that might split the black community in Madison (both Moody and Callaway are black). Moreover, Callaway's communications were always made in a context relating to the resolution of her personal dispute with Moody. While the content of Callaway's communications touched upon an issue of public concern generally, she was not attempting to speak out as a citizen concerned with problems facing the school district; instead, she spoke as an employee attempting to resolve her private dilemma. Therefore, because such speech stands unprotected from employer scrutiny when uttered in the pursuit of purely private interests, we decline to enter the fray surrounding personnel decisions taken by public employers.
 
 The judgment of the district court is
 
 17
 AFFIRMED.
 
 
 
 [1]
 Where appropriate, we have adopted the district court's recitation of the facts throughout this opinion