

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-1996

# Azzaro v. Allegheny

Precedential or Non-Precedential:

Docket 95-3253

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation
"Azzaro v. Allegheny" (1996). *1996 Decisions.* Paper 146.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/146

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

NO. 95-3253

----------

BEVERLY AZZARO,
                    Appellant

v.

COUNTY OF ALLEGHENY; TOM FOERSTER, an individual
    and Chairman, Allegheny County Commissioners
              and WAYNE FUSARO

----------

On Appeal from the United States District Court
    for the Western District of Pennsylvania
            (D.C. Civil No. 93-1589)

----------

Argued December 7, 1995

BEFORE: STAPLETON,
    SAROKIN, and ROSENN, Circuit Judges

----------

(Opinion filed July 31, 1996)

Michael J. Healey, Esq. (ARGUED)
Healey, Davidson & Hornack
Fifth Floor
Law & Finance Building
Pittsburgh, PA  15219

          Attorney for Appellant


Ira Weiss, Esq.
County Solicitor
Robert L. McTiernan, Esq. (ARGUED)
Ass't County Solicitor
Caroline Liebenguth, Esq.
Ass't County Solicitor
Allegheny County Law Dep't
300 Fort Pitt Commons Building
445 Fort Pitt Blvd.
Pittsburgh, PA  15219

----------

OPINION OF THE COURT

----------

SAROKIN, Circuit Judge:

Plaintiff's claims for retaliatory discharge following her reports of sexual harassment were dismissed on summary judgment. Contrary to the district court, we conclude that there was sufficient evidence upon which a reasonable factfinder could conclude that there was a causal link between plaintiff's complaint of sexual harassment and her termination. We also conclude that there was sufficient evidence to conclude that plaintiff was discharged as a result of speech protected by the First Amendment.

We recognize that most complaints of sexual harassment are likely to have as their primary purpose the vindication of the private rights of the person offended. However, a public employee's complaints of sexual harassment by a public official, because they disclose serious official malfeasance, are inherently of public concern even if made in a private forum. Unless the employee's interests in speaking out upon matters of public concern are outweighed by the public employer's interests in running an efficient workplace, the speech is protected under the First Amendment.

I.

We begin by setting forth a brief "Cast of Characters" to serve as a reference and a guide through the complicated factual maze that follows. All of the individuals listed below are employees of the County of Allegheny, Pennsylvania.

| | |
|---|---|
| Beverly Azzaro | Plaintiff, employee of Dept. of Development |
| Chuck Azzaro | Plaintiff's husband |
| George Braun | Director of Dept. of Development (Hohman's successor) |
| Donna Brusco | Employee of Dept. of Employee Relations, close personal friend of defendant Fusaro |
| Tom Foerster | Defendant, County Commissioner |
| Tom Fox | Plaintiff's supervisor |
| Wayne Fusaro | Defendant, Assistant to |

|                    | Commissioner Foerster, accused by plaintiff of sexual harassment |
|--------------------|------------------------------------------------------------------|
| Joe Hohman         | Director of Dept. of Development (prior to Braun)                 |
| Don Kovac          | Director of Dept. of Employee Relations                          |
| Harry Kramer       | Executive Assistant to Commissioner Foerster                     |
| Sal Sirabella      | County Director of Administration                                |

### A.

Plaintiff Beverly Azzaro worked for Allegheny County in various capacities from March, 1979 until June 19, 1992, when she was discharged from her position as marketing coordinator in the Allegheny County Department of Development. Subsequently, she filed a discrimination charge with the Equal Employment Opportunity Commission alleging retaliatory discharge "because of [her] refusal to agree to sexual advances and subsequently [sic] complaint of unwelcomed sexual advances." App. 104.

The circumstances of Azzaro's discharge are disputed by the parties. According to Azzaro, the chain of events that resulted in her termination began on June 11, 1991--just over a year before she was discharged--when her husband, who was also employed by the County, had a verbal confrontation with employees of the County Department of Employee Relations regarding the manner in which the Azzaros' daughters were treated in connection with their applications for jobs as County lifeguards. The Director of the Department of Employee Relations, Don Kovac, reported the incident to Harry Kramer, who is the Executive Assistant to County Commissioner Tom Foerster, indicating that his employees were upset by Mr. Azzaro's behavior. Kramer instructed Wayne Fusaro, an assistant to Foerster who was acquainted with Mr. Azzaro, to speak with Mr. Azzaro and request that he apologize. Accordingly, Fusaro dropped by Mr. Azzaro's office, and Mr. Azzaro apologized to the appropriate people.

Plaintiff Azzaro learned of these events a day or two later through her husband and through a co-worker, Donna Brusco, who had heard the story from Fusaro. Plaintiff testified that Brusco told her that Fusaro had said Mr. Azzaro's job might be in danger as a result of the incident. Fearing for her husband's position and hoping to smooth things over, plaintiff Azzaro went to Commissioner Foerster's offices to talk to Fusaro.

What happened after Azzaro entered Fusaro's office is the subject of some dispute. Because we are obligated on summary judgment to construe the facts in the light most favorable to the nonmoving party, we will present Azzaro's version of the events. Azzaro testified that she began to cry, and Fusaro drew near her.

She became uncomfortable and made her way to a chair across the room. Fusaro shut the office door and pulled a chair very close to hers. He then began pulling open the lapels of her blazer, saying "let me see." App. 120. She tried to hold the blazer shut, telling him to stop and saying "[w]hat the hell is wrong with you," but he put his hand inside and pulled her blouse out of her slacks. App. 121. At that point, Azzaro rose, saying "what's wrong with you. Stop it. I'm here for the kids . . . ." Id. She continued to try to evade Fusaro, standing when he sat down and sitting when he stood. Suddenly, Fusaro unzipped his pants and put his hand inside the zipper. Id. Plaintiff stood up and said loudly, "[a]re you nuts." App. 123. As soon as plaintiff "got loud," Fusaro "assumed . . . [a] professional attitude." Id. Azzaro said, "I don't think you want Donna [Brusco] to know about this, do you, Wayne?" Id. Fusaro shook his head, then sat down at his desk and took a phone call. After he hung up, he said, "Beverly, I want you to promise what happened here is never going to go any further." App. 124. Plaintiff promised.

Fusaro denies all allegations of sexual assault or impropriety.

Plaintiff did not immediately report the incident. She told her daughters of the incident on the day it occurred, however, and told her husband and a friend the following day. She and her husband decided at that time not to report the matter or pursue it further for fear that they could lose their jobs. Azzaro testified that she did tell several co-workers of the incident, including Mary Ionadi, Harry Rohm, Mark Patrick and Cheryl Zentgraf. Donna Brusco testified that Azzaro also told Kevin O'Laughlin and Mickey Maycar, both of whom mentioned those conversations to Brusco.

Finally, in October 1991, Azzaro told her supervisor, Tom Fox, of the incident at a party during a discussion of the Anita Hill hearings. Fox expressed shock and urged Azzaro to report it. The following Monday, he called her into his office, asked her to repeat the story, and pressed her once again to report the incident to the Director of the Department of Development, Joe Hohman. He told her that if she did not report it, he would be obliged to do so on his own. Plaintiff asked him not to do so, telling him, "I . . . [am] scared for my job and my husband's job." App. 163.

Subsequently, Fox told Hohman himself. In so doing, he impressed upon Hohman that he was telling him in confidence and that Hohman should not take any action unless he felt that he had an obligation to do so as Director of the department. Hohman told Fox that if Azzaro wanted to pursue the matter, she would have to report to him directly.

Meanwhile, Hohman was growing concerned that his relationship with Commissioner Foerster was deteriorating because Foerster no longer sought his input or advice. Hohman scheduled a meeting with Commissioner Foerster in December, 1991 to address these concerns. Foerster invited his assistants, Fusaro and Kramer, to attend. During the course of the meeting, Hohman stated that he "had problems with the people [Foerster] was

surrounding himself" with, such as Wayne Fusaro.  Hohman
testified that he said at the meeting,

> Wayne Fusaro . . . potentially has a sexual harassment
> case coming against him from an employee in my office
> who I cannot name because the employee has not given me
> permission to name, but it occurred right upstairs in
> this office, Commissioner, over a summer job for her
> daughters.

App. 361-63.  Both Foerster and Kramer offered a slightly
different account, testifying that Hohman mentioned a possible
lawsuit against Fusaro but did not say that it concerned
allegations of sexual harassment or offer any other details
regarding the incident or the alleged victim.  However, both men
had testified under oath in a previous, related case that Hohman
accused Fusaro of sexual harassment at that meeting.  It is
uncontroverted that Hohman neither mentioned Azzaro's name nor
offered any substantive details of the incident.

While this meeting was taking place, Azzaro reported the
incident to the County Director of Administration, Sal Sirabella.
Under the County's sexual harassment policy, the Director of
Administration is the official ultimately responsible for
reviewing reports of sexual harassment and deciding what official
action to take.  Azzaro testified that she went to Sirabella
because he was an official in "high office" whom she could trust.
App. 143.  When he asked what she wanted him to do, she replied:
"I don't know what to do.  That's why I'm here."  App. 146-47.
Sirabella allegedly replied, "[L]et's leave it alone for now . .
. ."  App. 147.  Azzaro testified that she did not ask Sirabella
to keep their conversation confidential.  According to Sirabella,
however, Azzaro asked him to keep the content of their
conversation confidential.  Azzaro's husband, who attended the
meeting with Sirabella, also indicated that he thought his wife
told Sirabella that "she'd prefer him to keep it confidential."
App. 225.  Sirabella did not take any action or discuss Azzaro's
allegations with anyone.

That evening, Donna Brusco phoned Azzaro at home.  She had
spoken to Fusaro about the incident in Commissioner Foerster's
office, and told Azzaro that Joe Hohman had been in Commissioner
Foerster's office that day, that he had been "extremely upset,"
and that he "was screaming at Commissioner Foerster that Wayne
[Fusaro] was a pervert."  App. 168.  Brusco said that Fusaro had
been too upset to tell her all the details.  She then asked
Azzaro why she had gone to see Sirabella that day.  Subsequently,
according to Sirabella, Fusaro asked Sirabella "three or four
times" what the purpose of Azzaro's visit had been.  App. 172.

### B. Termination

Azzaro alleges that she was fired in retaliation for her
actions in the aftermath of the Fusaro incident.  According to
Azzaro, this retaliation was engineered by Fusaro and Brusco, who
share a close personal relationship.  Fusaro began by calling Don
Kovac, who was the Director of Employee Relations during the
relevant time period and was responsible for coordinating
personnel activity for all county employees.  Fusaro told Kovac

that he suspected that the Department of Development, where Azzaro worked, had employees on the payroll who were disloyal to Commissioner Foerster. He asked Kovac to allow Donna Brusco and another member of the Employee Relations Department to "review the entire payroll in the Department of Development to pick out people that were loyal to Foerster and people that were loyal to Brimmeier," who was Foerster's opponent. App. 417. Because Brusco had worked for the Department of Development until she was transferred to the Employee Relations Department at Fusaro's request in the fall of 1991, she was ostensibly familiar with the entire Department of Development payroll and aware of people's loyalties. Fusaro told Kovac that he had authorization to compile the list from both Commissioner Foerster and his assistant, Harry Kramer. Accordingly, Kovac granted his permission and appointed John Chapman, another employee of the Employee Relations Department, to assist Brusco.

Approximately eight to ten weeks prior to Azzaro's termination, Chapman and Brusco reviewed the list of Department of Development employees in accordance with Fusaro's request. As they did so, Brusco identified certain names as pro-Foerster or anti-Foerster. Azzaro alleges that the list of anti-Foerster names was a "hit list" and that she was a target. Appellant's Brief at 11. Indeed, Chapman testified that he had heard Fusaro say on more than one occasion that Brimmeier supporters would be "retaliated against." App. 273. When Chapman and Brusco reached Azzaro's name, according to Chapman, Brusco said, "We're going to get this bitch." App. 274. On June 19, 1992, George Braun, who had replaced Hohman as Director of the Department of Development, told Azzaro that her position would be eliminated as of August 1 due to budgetary reasons unrelated to her job performance. According to the explanation offered by Braun and asserted by defendants in this case, the elimination of Azzaro's position was motivated by a directive of the federal Department of Housing and Urban Development that required the county Department of Development to reduce the portion of its budget dedicated to administrative expenses by two or three percent in order to retain its federal funding. While this same federal directive had been in place during Hohman's tenure as Director of the Department of Development, Hohman had not taken steps to address it because he believed the problem would correct itself over time.

After Braun took over as Director of Development in March 1992, the Department of Development entered into an agreement with HUD which required Development to spend less than the permitted amount on administrative expenses for three years to offset excess administrative expenditures in prior years. Braun sought to satisfy the terms of this agreement by reorganizing the Department of Development. He drafted a proposal to merge together several divisions and eliminate the Marketing Division, in which Azzaro worked. Under the heading "Positions to be Terminated," the proposal specifically named Azzaro and Tom Fox, the supervisor to whom she had reported the incident, along with two employees whose pensions had already vested. App. 31. At the same time, the proposal recommended hiring nine new employees

and increasing the salaries of eight others.

Braun submitted this proposal to Commissioner Foerster's assistant, Harry Kramer, who approved it and passed it on to the Salary Board.  On June 18, 1992, the Salary Board approved the proposed restructuring of the Department of Development.  The following day, more than one year after the alleged harassment took place, Azzaro was discharged.

### C. Pretext

Azzaro maintains that defendants' explanation is purely pretextual.  To support her argument, she points to evidence that the county's action in pulling her position out from under her and making no effort to place her elsewhere was unprecedented.  Although the county had fairly frequently eliminated vacant positions in the past, only once in the preceding fourteen years had it eliminated staffed positions--and those staffed jobs, unlike Azzaro's, had been designated from the outset as temporary positions.  Moreover, the Department of Employee Relations had "made every attempt to place" the displaced employees in new positions for the county.  App. 407.  In Azzaro's case, by contrast, no attempt was made to retain her as a county employee, notwithstanding the fact that there were hundreds of unfilled county positions available at the time.

Azzaro further argues that the county's excess administrative spending could have been reduced over time through attrition.  She points out that Hohman, whom Braun succeeded as Director of Development, had believed that the problem could be addressed without layoffs.  The Letter of Agreement that HUD and the county executed in May, 1992 required the county to make up for the excess expenditures over a four-year "mitigation period." App. 96.  By the end of fiscal 1992, however, the county had already reduced spending sufficiently to solve the problem and compensate the government for the excess expenditures of the past.  Azzaro cites these facts as evidence that her termination was not necessary to bring the county into compliance with the HUD directive, and concludes that defendant's explanation of her termination as a budgetary necessity is purely pretextual.

### II.

In September, 1993, Beverly Azzaro filed a three-count complaint in the United States District Court for the Western District of Pennsylvania against the County of Allegheny, Commissioner Tom Foerster, and Wayne Fusaro.  Count I asserts a claim against all defendants under 42 U.S.C.  1983 for infringement of her First Amendment rights; Count II alleges retaliatory discharge against Allegheny County in violation of 42 U.S.C.  2000(e); and Count III alleges violations of the Pennsylvania Human Relations Act, 42 P.S.  955(a), (d) & (e), against Allegheny County.

Defendants filed a joint motion for summary judgment which the district court granted, deciding Counts I and II on the merits and declining to exercise supplemental jurisdiction over plaintiff's state-law claims.  Plaintiff filed a timely notice of appeal.  We have jurisdiction over this appeal pursuant to 28 U.S.C.  1291, which grants us jurisdiction over appeals from final orders of federal district courts.  The district court had

jurisdiction over the federal causes of action pursuant to 28 U.S.C.  1331, and had supplemental jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C.  1367(a).

### III.

We exercise plenary review over a district court's decision to grant summary judgment.  Commercial Union Ins. Co. v. Bituminous Casualty Corp., 851 F.2d 98, 100 (3d Cir. 1988).  In determining whether summary judgment is appropriate, we are required to apply the same test that the district court should have applied initially.  Id.

A motion for summary judgment shall be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A fact is material if it could affect the outcome of the dispute.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The task of the court at the summary judgment stage is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  Thus, we must resolve all reasonable doubts in favor of the non-moving party.  Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).

### A. Title VII Claim

To establish a prima facie case of retaliatory firing in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.  2000(e), a plaintiff must establish that (1) she engaged in a protected activity; (2) she was discharged after or contemporaneously with that activity; and (3) there was a causal link between the protected activity and the firing.  Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir.), cert. denied, 502 U.S. 940 (1992).  Because Title VII places the burden of persuasion on the plaintiff, the defendant is entitled to summary judgment if it can show that the plaintiff is unable to establish one or more of the elements of this prima facie case.  Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989), cert. denied, 493 U.S. 1023 (1990).  In this case, the district court concluded that Azzaro had failed to bring forward any competent evidence of a causal connection between her allegations of sexual harassment and her discharge, and therefore granted summary judgment in favor of defendants.  Azzaro v. County of Allegheny et al., No. 93-1589, slip op. at 19 (W.D. Pa. filed March 31, 1995).

As neither party challenges the district court's conclusions with respect to the first two elements of the prima facie case for retaliatory discharge, we will address them only briefly. First, under the EEOC's Guidelines, an employee's opposition to any unlawful employment practice is protected.  Magnuson v. Peak Technical Services, Inc., 808 F. Supp. 500, 515 n.13 (E.D. Va. 1992) (citing EEOC Compliance Manual, 704(a) Discrimination, 492.2(e)), aff'd, 40 F.3d 1244, 1994 WL 619727 (4th Cir. 1994). Therefore, Azzaro's actions in reporting the incident with Fusaro clearly constitute a protected activity within the meaning of Title VII.  As it is undisputed that Azzaro lost her job, she satisfies the second requirement of Title VII as well.

The controversy swirls around the third prong of the test: causation.  The district court granted summary judgment on the

ground that plaintiff could not establish a causal link between the protected activity and her discharge, because "there is no competent evidence that those persons involved in the decision to reorganize the DOD were aware of the alleged sexual harassment prior to the approval of the reorganization." Azzaro, No. 93-1589, at 19. We disagree.

To establish a causal connection sufficient to state a prima facie case of retaliatory discharge under Title VII, a plaintiff must proffer "evidence sufficient to raise the inference that the protected activity was likely the reason for the adverse action." Zanders v. National Railroad Passenger Co., 898 F.2d 1127, 1135 (6th Cir. 1990). In this case, plaintiff proffered the following evidence in support of her theory of retaliation. First, she produced evidence showing that Hohman stated at a meeting with Foerster, Fusaro and Kramer that Fusaro sexually harassed a Department of Development employee in connection with an incident regarding summer jobs for her daughters. As both Fusaro and Kramer had been informed of the incident with Azzaro's husband and had been involved in resolving the dispute, Hohman's statement is sufficient to support a finding that Fusaro and Kramer knew of Azzaro's allegations. Moreover, since Fusaro and Kramer were close personal advisors of Foerster and since Foerster was present at the meeting, a reasonable jury could find that it is more probable than not that Foerster, too, knew or later learned that Azzaro was the employee in question.

Second, plaintiff produced evidence that Fusaro, upon learning of plaintiff's meeting with Sirabella, asked Sirabella what the meeting was about, and that Brusco called plaintiff to make the same inquiry. A jury could reasonably infer from this evidence, and from the evidence discussed above about the meeting among Hohman, Fusaro, Kramer and Foerster, that Fusaro believed plaintiff had broken her promise not to disclose the incident, and that Fusaro accordingly arranged to terminate plaintiff in retaliation.

Third, plaintiff proffered evidence that, following the alleged harassment, her name was placed on a "hit list" of Department of Development employees which was compiled by Fusaro's close friend and ally, Donna Brusco, at Fusaro's request.

Fourth, she brought forward uncontroverted evidence showing that defendants' action in eliminating her position was unprecedented in county history and contravened established principles regarding the treatment of county personnel.

Fifth, she proffered evidence that defendants' stated reason for eliminating her position and discharging her was pretextual. The evidence demonstrated that the administrative cost overrun could have been corrected by attrition, without layoffs; that the reorganization plan which resulted in Azzaro's termination also recommended nine new hires and eight salary increases; that drastic measures were not necessary because the Department had four years to solve the budget problem; that the problem had been fully addressed by the end of 1992, two years earlier than was required; and that Azzaro was the only employee in the last fourteen years whose position was eliminated and who was not

offered a transfer to a different county position.  We believe that these contentions are more than sufficient to support a finding that the defendants' alleged reason for discharging Azzaro was a pretext.

It is true, as defendants point out, that plaintiff did not produce any direct evidence that Director of Development Braun, who drafted the reorganization plan that resulted in Azzaro's discharge, knew of Azzaro's allegations or acted in concert with the defendants.  In light of the ample evidence that plaintiff produced suggesting that Braun's justification for his recommended action was pretextual, however, we conclude that granting summary judgment against plaintiff for failure to produce direct evidence of Braun's knowledge is inappropriate.  Plaintiff has produced sufficient evidence to support a finding in her favor by a reasonable factfinder, and she should be allowed to proceed.

## B. Section 1983 Claim

Count I of the complaint alleges that plaintiff was discharged as a result of protected speech in violation of the First Amendment and section 1983.  We employ a three-step analysis to determine whether a public employee was fired as a result of protected speech.  Swineford v. Snyder County, 15 F.3d 1258, 1270 (3d Cir. 1994).  First, plaintiff must establish that she was engaged in a protected activity.  Id.  If she succeeds, then she must show that the protected activity was a "substantial or motivating factor in her discharge."  Id.  A plaintiff who satisfies both of these burdens will prevail unless the defendant then proves that it would have fired the employee regardless of the protected speech.  Id.  The district court granted summary judgment on the grounds that plaintiff had failed to satisfy either of the first two prongs of the Swineford test.  We will examine each in turn.

### 1.

To determine whether plaintiff engaged in a protected activity, we engage in a two-step inquiry.  First, we determine whether her speech was related to a matter of public concern.  Swineford, 15 F.3d at 1270.  If the answer is no, then plaintiff's speech is not protected and our inquiry is at an end.  Id. at 1273 n.13.  If the answer is yes, then we proceed to the second step of the inquiry: "balancing the public employee's interests in commenting on matters of public concern against the public employer's interests in efficiency."  Id. at 1270.  If the employee's interest in speaking on a matter of public concern outweighs the employer's interest in providing efficient services, then the speech is protected under the First Amendment. The district court ruled that plaintiff's speech was not related to a matter of public concern and granted summary judgment on that basis without reaching the second part of the inquiry into whether plaintiff's speech is protected.  Accordingly, we will confine our analysis to that issue.

Just what constitutes a matter of public concern for First Amendment purposes has never been precisely defined.  SeeSanguini v. Pittsburgh Board of Public Educ., 968 F.2d 393 (3d Cir. 1992).  While it is axiomatic that "matters only of personal

interest" do not constitute matters of public concern, Connick v. Myers, 461 U.S. 138, 147 (1983), there is no bright line rule or test that can be applied to determine when speech is personal in nature and when it is public. Instead, the determination of whether speech is related to a matter of public concern involves an inquiry into the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48.

Where, as here, the speaker is a public employee, the First Amendment inquiry is somewhat more refined. This court has stated that "speech by public employees is deemed to be speech about public concern when it relates to their employment so long as it is not speech upon matters of only personal interest." Swineford, 15 F.3d at 1271. Thus, as Mrs. Azzaro is a public employee and the speech at issue relates to her employment, her speech will be protected under the Swineford rule unless it is limited to matters of only personal interest.

The public and the personal often overlap, however, and the line between the two is rarely distinct. The distinction is especially blurry in the context of speech regarding sexual harassment. As a general matter, we believe that the topic of sexual harassment of employees by a public official is one "inherently of public concern." Connick, 461 U.S. at 148 n.8 (noting that racial discrimination is a matter inherently of public concern); Callaway v. Hafeman, 832 F.2d 414, 417 (7th Cir. 1987) (extending that principle to speech regarding sexual harassment). At the same time, however, speech alleging sexual harassment is almost always personal in nature. It therefore seems inevitable that speech regarding sexual harassment will involve elements of both public and private interest.

In sorting out the public and private elements of speech, the Supreme Court has occasionally looked to see whether the speech arose in the context of a personal employment dispute. See Connick, 461 U.S. at 148 & n.8; Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979). The Court relied most heavily on this factor in Connick v. Myers. Connick involved an Assistant District Attorney who opposed the District Attorney's attempt to transfer her to a different division of the criminal court. As part of her efforts to resist the transfer, she prepared and distributed a questionnaire soliciting the views of her co-workers concerning office transfer policy, morale, confidence in supervisors, whether a grievance committee should be instituted, and whether employees felt pressured to work on political campaigns. 461 U.S. at 140-41. Subsequently, due to her distribution of the questionnaire, she was fired.

The Court found that the questions, with one exception, were mere "extensions of Myers' dispute over her transfer to another section of the criminal court" and were not "of public import in evaluating the performance of the District Attorney as an elected official." The Court reasoned that

Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to

> bring to light actual or potential wrongdoing or breach
> of public trust on the part of Connick and others.
> Indeed, the questionnaire, if released to the public,
> would convey no information at all other than the fact
> that a single employee is upset with the status quo. .
> . . [T]he focus of Myers' questions is not to evaluate
> the performance of the office but rather to gather
> ammunition for another round of controversy with her
> superiors.  These questions reflect one employee's
> dissatisfaction with a transfer and an attempt to turn
> that displeasure into a cause celebre.

Id. at 148.  The Court concluded that "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."  Id. at 149.

In addition, the Court suggested in a footnote that its holding in a prior First Amendment case, Givhan v. Western Line Consol. Sch. Dist., turned in part on the fact that the speech at issue was not tied to a personal employment dispute, although this had not been mentioned as a factor in the opinion itself. Connick, 461 U.S. at 148 n.8.  In Givhan, the Court held that complaints regarding racial discrimination in a school district's hiring process, voiced privately by a teacher to the school principal, were protected speech.  Discussing this holding in Connick, the Court explained that the speech at issue in Givhanwas protected despite the choice of a private forum because it addressed a matter "inherently of public concern" and was "not tied to a personal employment dispute."  461 U.S. at 148 n.8. The implication of this footnote is that the speech in Givhanwould not have been protected had it been "tied to a personal employment dispute."

Although the Court has never precisely defined the phrase "tied to a personal employment dispute," it seems clear from the facts of Connick that the phrase refers to speech by a public employee that is wholly tied to such a dispute without any broader public element.  This conclusion is based on the fact that, although all of the speech involved in Connick arose from a personal employment dispute and was apparently intended to further the interests of the employee in that dispute, the Court nevertheless found that one component of that speech was protected because it "touch[ed] upon a matter of public concern." 461 U.S. at 149.  The combined message of Connick and Givhan, therefore, is that speaking on a topic "inherently of public concern," id., in and of itself, does not entitle a public employee to First Amendment protection; rather, a public employee must speak out at least partly "as a citizen" on such a topic, and not purely "as an employee upon matters only of personal interest," in order to gain protection.  Id. at 147 (emphasis added); see United States v. National Treasury Employees Union, 115 S. Ct. 1003, 1013 (1995) (noting that "speech that involves nothing more than a complaint about a change in the employee's own duties" is not protected).  In other words, if an employee speaks on a topic--such as racism or sexual harassment--that is inherently of public concern, but her speech is "tied to a

personal employment dispute" and does not transcend that dispute, her speech is not protected.  Connick, 461 U.S. at 148 n.8.

Because sexual harassment in the workplace, by its very nature, is an employment issue, speech regarding such sexual harassment is highly likely to arise in the context of a personal employment dispute.  The Court has never spoken on the issue of whether or under what circumstances sexual harassment allegations constitute speech on a matter of public concern, however, and thus has not addressed the relevance of personal employment disputes to the determination of whether such allegations are personal or public in nature.  Those lower courts that have addressed the protected status of sexual harassment allegations have all but unanimously concluded that such allegations are not protected unless the speaker takes some measure to expand her speech beyond the context of the personal employment dispute in which it arose or to give it broader relevance.  This may include speaking in a manner that exposes official malfeasance, warning other employees to prevent them from undergoing a similar ordeal, or voicing a private complaint about systemic sexual harassment.

For example, in Callaway v. Hafeman, where an employee of the Madison, Wisconsin school district alleged that she had been harassed by the district's Public Relations Director, the Seventh Circuit concluded that allegations of harassment which are "limited . . . to oral statements intended to be purely confidential" are not matters of public concern.  832 F.2d at 417.  The court reasoned that, "[w]hile the content of Callaway's communications touched upon an issue of public concern generally, she was not attempting to speak out as a citizen concerned with problems facing the school district; instead, she spoke as an employee attempting to resolve her private dilemma."  Id.  Under the Seventh Circuit's analysis, it appears that allegations of sexual harassment leveled against a public official are not protected unless the plaintiff treats them as a social problem as well as a personal one; the plaintiff's confidential, internal complaints regarding her personal employment dispute did not rise to the level of speech that discloses official malfeasance.

In Saulpaugh v. Monroe Community Hosp., 4 F.3d 134 (2d Cir. 1993), cert. denied, 114 S. Ct. 1189 (1994), the Second Circuit found that a public employee's complaints of sexual harassment, voiced to two coworkers and two supervisors, were "motivated by and dealt with her individual employment situation" and thus were not a matter of public concern.  Id. at 143.  The court reasoned that because there was "no indication that the plaintiff 'wanted to debate issues of sex discrimination,' that her suit 'sought relief against pervasive or systemic misconduct by a public agency or public officials,' or that her suit was 'part of an overall effort . . . to correct allegedly unlawful practices or bring them to public attention.'"  Id. (quoting Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 420 (7th Cir. 1983)).

In Bedford v. Southeastern Pennsylvania Trans. Auth., 867 F. Supp. 288 (E.D. Pa. 1994), the court analyzed a police dispatcher's complaint of sexual harassment by police officers and an undersheriff as follows:

> Had plaintiff publicly complained of sexual

> harassment, her statement would clearly relate to a
> matter of legitimate public concern.  Where one voices
> an internal complaint of an act of harassment or
> discrimination to secure some personal advantage, the
> complaint is arguably a matter of private interest
> only.
>       Where, however, one complains to her employer of
> alleged sexual harassment . . . not to secure personal
> gain but to expose and protect herself and other female
> employees in the future from such conduct, the court
> concludes that it does touch upon a matter of
> legitimate public concern.

Id. at 295-96 (internal citations omitted).  Under Bedford,
internal complaints intended only to secure relief or protection
for the complainant are not protected, while internal allegations
intended to inform and protect others are comprehended by the
First Amendment.  See also Morgan v. Ford, 6 F.3d 750, 755 (11th
Cir. 1993) (finding that correctional officer's sexual harassment
allegations against lieutenants, which consisted entirely of
complaints to official bodies, were not a matter of public
concern because they were made solely to further the plaintiff's
personal interest in improving the conditions of her employment),
cert. denied, 114 S. Ct. 2708 (1994); Woodward v. City of
Worland, 977 F.2d 1392 (10th Cir. 1992) (finding that
dispatchers' formal complaints of sexual harassment by police
officers and undersheriffs did not constitute a matter of public
concern because the thrust of plaintiffs' allegations was that
they personally were being harassed and wanted that harassment to
stop), cert. denied, 509 U.S. 923 (1993); Wilson v. UT Health
Center, 973 F.2d 1263 (5th Cir. 1992) (finding that UTHC police
sergeant's reports of sexual harassment perpetrated on several
women including herself by UTHC police officers constituted a
matter "of great public concern"), cert. denied, 507 U.S. 1004
(1993).  While these courts have articulated slightly different
standards, they have unanimously agreed that reports of sexual
harassment must somehow transcend the personal employment dispute
in which they are rooted--for example, by publicly exposing
official malfeasance or protecting others from similar treatment-
-in order to gain protected status.
      While we agree with the basic principle that allegations of
sexual harassment must somehow transcend the complainant's
personal employment dispute in order to gain protected status, we
believe that the above cited authorities interpret the phrase
"tied to a personal employment dispute" more broadly than the
Supreme Court intended it.  To determine whether speech is
protected, courts must examine the "content, form, and context of
a given statement, as revealed by the whole record."  Connick,
461 U.S. at 147-48 (emphasis added).  The fact that speech arose
in the context of a personal employment dispute may be a relevant
factor in making that determination, but it is not dispositive--
i.e., speech is not considered to be "tied to a personal
employment dispute"--unless the content, form and context of the
speech reveal that it does not concern a matter of public import.

To hold otherwise would be to contravene the principle that "a public employee does not relinquish First Amendment rights to comment upon matters of public interest by virtue of government employment."  Id. at 140.

In Callaway and Morgan, however, the courts apparently decided on the basis of context and form only that the speech at issue was tied to a personal employment dispute.  Because the plaintiffs in those cases were motivated by a desire to improve the conditions of their own employment, and voiced internal complaints of sexual harassment, the courts concluded that their speech was tied to a personal employment dispute and hence not protected.  Callaway, 832 F.2d at 417 ("We agree with the district court that "[i]n this case, the context and form of the speech leads to the inescapable conclusion that . . . [Callaway's] concern was personal, not public."); Morgan, 6 F.3d at 755 (finding speech unprotected because it "was driven by [plaintiff's] own entirely rational self-interest in improving the conditions of her employment" and because plaintiff "did not relate her concerns about sexual harassment to the public, or attempt to involve the public in any manner") (footnote omitted).  This curtailed inquiry, which elevates employment context and speaker motivation over content, contravenes the three-part test (content, form, and context) set forth by the Supreme Court in Connick.  Under this three-pronged inquiry, speech is only wholly tied to a personal employment dispute if nothing in its content is relevant to the public; even if speech arises in the context of a personal employment dispute, it will be protected if its content touches on a matter of public concern.  Connick, 461 U.S. at 147-49; see also Swineford, 15 F.3d at 1271 (stating that speech by public employees which relates to their employment is speech on a matter of public concern unless its content is purely personal in nature).

Supreme Court cases dealing with the protected status of employment-related speech by public employees have clearly and consistently indicated that even speech arising from a personal employment dispute will be protected if its content touches on a matter of public concern.  In Connick, for example, the Court looked closely at the content of the speech at issue as well as its context and form to determine whether it was tied to a personal employment dispute, noting that "the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo."  461 U.S. at 148.  Subsequently, while discussing the distinction between speech as a citizen on matters of public concern and speech as an employee on matters of only personal interest in United States v. National Treasury Employees Union, the Court stated that:

> [P]rivate speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer.  If, however, the speech does involve a matter of public concern, the Government bears the burden of justifying its adverse employment action.

115 S. Ct. at 1013. This language confirms that the phrase "tied to a personal employment dispute" is a question of content as well as context; the Court clearly indicated that speech that arises in the context of a personal employment dispute andconcerns issues that would interest only the individual complainant--such as the scope of his or her duties on the job-- is not protected, whereas speech that involves a matter of public concern, whether rooted in a personal employment dispute or not, is protected.

To the extent that the above cited cases have concluded that internal complaints of sexual harassment leveled against public officials are not protected, they are also in conflict with Third Circuit case law regarding the relevance of the speaker's motivation to the First Amendment inquiry. This court has held that a speaker's motivation for speaking is "one factor to be considered" in determining whether speech is protected, but "complete reliance on . . . motivation . . . is inappropriate." Rode v. Dellarciprete, 845 F.2d 1195, 1201 (3d Cir. 1988). The message of Rode is that even if a speaker was motivated by purely personal considerations, such as stopping a pattern of harassment or improving the conditions of her employment, her speech may still be protected if its content touches on a matter of public concern. Under the approach taken by the Seventh and Eleventh Circuits, however, a finding that the speaker was motivated by a desire to improve the conditions of her employment is, in and of itself, sufficient to render her speech unprotected, regardless of the specific content of that speech. Morgan, 6 F.3d at 754 ("[W]e must determine whether the purpose of Morgan's speech was to raise issues of public concern, on the one hand, or to further her own private interest, on the other."); Callaway, 832 F.2d at 417 (stating that the Supreme Court's decision in Connickrequires courts to look at the point of the speech in question). In sum, we conclude that speech is a matter of public concern if it discloses malfeasance or misfeasance on the part of a public official of sufficient gravity to be of legitimate interest to members of the community. Whether the subject of a communication is such a matter is of course a fact-sensitive inquiry.

In this case, we are convinced by the form, context andcontent of plaintiff's speech that it has sufficient public elements to merit First Amendment protection, notwithstanding the fact that it is rooted in a personal employment dispute. Plaintiff testified that she reported the alleged harassment to Director of Administration Sal Sirabella, who is the official ultimately responsible for deciding what official action to take in response to complaints of sexual harassment, seeking advice as to what she should do. According to plaintiff, Sirabella responded that she should simply "leave it alone for now." App. 147. Thus, Azzaro reported the incident as fully as the County, through Sirabella, actually required her to do. Plaintiff's report to Sirabella, "if released to the public," Connick, 461 U.S. at 148, would expose the alleged malfeasance of a government official who is a close personal advisor to the Commissioner. We believe that where, as here, a complainant reports sexual

harassment by a public official, her speech touches on a matter of public concern even if motivated by purely personal considerations, because it exposes the potential malfeasance of a public official. See id.; Swineford, 15 F.3d at 1271 (stating that "speech disclosing public officials' misfeasance is protected"). If a government employee complained of not receiving a promotion because she failed to pay a bribe demanded by her superior, that speech would be a matter of public concern, even though her sole interest was to obtain the promotion. Complaints of sexual harassment by government officials do not cease to be matters of public concern simply because the complainant seeks solely to have some personal right vindicated. A personal desire for confidentiality or relief limited to the complainant cannot and should not transform a matter of public concern into one that is solely private. Indeed, when a public employee reports an incident of sexual harassment by a public official in the manner specifically set forth by the government agency for whom she works, thereby calling the malfeasance of a government official to the attention of the relevant authorities in the manner prescribed by those authorities, we would be hard-pressed to conclude that her speech does not expose the malfeasance of a public official or constitute a matter of public concern.

Although we conclude solely on the basis of plaintiff's report to the appropriate county official that her speech was protected, we note that several additional factors lend support to that conclusion. First, plaintiff's meeting with Sirabella provides evidence of motive--a relevant, albeit not dispositive, factor in the public concern inquiry. Swineford, 15 F.3d at 1272. Thus, even if Sirabella had not been the official in charge of sexual harassment reports, we believe that plaintiff's conversation with him evidences an intent to expose the malfeasance of a public official. Second, unlike the plaintiff in Callaway, Azzaro told many co-workers of her complaint, and there was evidence that rumors regarding the incident were widespread in the office. This informal broadcasting is inconsistent with a desire to resolve the issue privately, and suggests that plaintiff may have sought to publicize the incident for non-personal reasons. A reasonable factfinder could conclude that plaintiff sought to disclose the malfeasance of one of the Commissioner's close personal advisors and warn other women in the office of his actions.

We are persuaded that our holding today that an internal report by a public employee of sexual harassment by a government official is a matter of public concern makes sense for public policy reasons as well as legal precedential ones. The general principle that speech which is wholly tied to a personal employment dispute is unprotected cannot be inflexibly and blindly applied; rather, the public or private nature of such speech must be evaluated in light of the surrounding circumstances. Sexual harassment presents a unique circumstance in which personal elements and public concerns are almost invariably intermingled and social pressures toward silence can be overwhelming. Ample evidence has demonstrated that sexual

harassment is an issue which its victims find extremely difficult to discuss privately, much less publicly. Given the inherent difficulty of broaching the topic of sexual harassment and disclosing such a sensitive problem to one's coworkers and/or community, we believe that greater flexibility is required in weighing the personal employment dispute aspects of the speech against its more public elements than the above-cited authorities allow. We cannot believe that the First Amendment protects only those victims of sexual harassment who either speak out for purely selfless reasons or are bold enough to shout their accusations "over the roofs of the world." Walt Whitman, Song of Myself, Leaves of Grass, in The Portable Walt Whitman 32, 96 (1973).

Because we conclude that plaintiff's report to Sirabella is sufficient to make her speech regarding a personal incident of sexual harassment by a government official a matter of public concern, we will reverse the district court's ruling on this issue.

2.

The district court also found that plaintiff had failed to satisfy the second prong of the Swineford test: establishing that the speech at issue was a "substantial or motivating factor in her discharge." Swineford, 15 F.3d at 1270. For the reasons stated in our discussion of causation under Title VII in Part III.A above, we conclude that a reasonable jury could find that plaintiff established a causal link between the protected speech and her termination. Accordingly, we will reverse the district court's grant of summary judgment on this ground as well.

Having reversed the district court's rulings on both of the first two prongs of the Swineford test, we will remand to the district court for further proceedings with respect to plaintiff's section 1983 claim.

IV.

Count III of plaintiff's complaint asserts a claim under the Pennsylvania Human Relations Act, 43 P.S. 955 et seq. The district court initially exercised supplemental jurisdiction over the claim, but subsequently dismissed the claim pursuant to 28 U.S.C. 1367(c)(3) in light of its ruling on defendants' motion for summary judgment. 28 U.S.C. 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction"). In light of our ruling today, we conclude that this dismissal was inappropriate and we hereby reverse it.

V.

For the foregoing reasons, we will reverse the district court's order granting summary judgment to defendants on Counts I and II and dismissing Count III, and remand for further proceedings consistent with this opinion.

BEVERLY AZZARO v. COUNTY of ALLEGHENY, et al.
No. 95-3253

ROSENN, Circuit Judge, dissenting.

I join in Parts I, II, IIIA, IV, and V of the majority's opinion. Although the evidence is tenuous, I agree that there may be sufficient facts in dispute that, if the plaintiff's version is believed, could lead a reasonable factfinder to conclude that Azzaro was discharged in retaliation for her complaints of harassment. The majority also believes that there was sufficient evidence to conclude that the plaintiff was discharged as a result of speech protected by the First Amendment. What separates me from the majority is its analysis and disposition of the First Amendment issue. I do not regard this amendment to be of lesser importance than does the majority, but I am unwilling to drape its majestic protection of freedom of speech around idle personal prattle.

I strongly disagree with the majority's dogmatic assertion that a public employee's complaints of sexual harassment by a fellow employee "are inherently of public concern even if made in a private forum," Maj. op. at 2, line 20, and its resulting conclusion that Azzaro's belated conversation with Sirabella "is sufficient to make her speech regarding a personal incident of sexual harassment by a government official a matter of public concern," Maj. op. at 33, and thus protected by the First Amendment. Because I believe that such a sweeping rule has the dangerous effect of elevating casual conversation to the level of constitutionally protected speech, seriously impeding normal discourse and management problems in the workplace, and inciting frivolous litigation, I must dissent from Part IIIB of the majority opinion.

I.

Over twenty-five years ago, the Supreme Court set forth a solid framework for analyzing claims of First Amendment violation by a public employee terminated or disciplined because of his or her speech. In Pickering v. Board of Education, 391 U.S. 563 (1968), the Court held that employees had a First Amendment right to speak on issues of public concern. There, a teacher wrote a letter to a local newspaper in connection with a proposed tax increase by the school board in which he criticized past proposals to raise new revenue for the schools. Whether a school system requires funds is a matter of legitimate concern for the community as a whole and on "such a question free and open debate is vital to informed decision-making by the electorate." Pickering, 391 U.S. at 571-2. The exercise of her right to speak on this issue could not furnish the basis for dismissal from employment. Id., at 574. On the other hand, if a public employee speaks out "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick v. Myers, 461 U.S. 138 (1983). The proper inquiry in determining whether Azzaro's

allegations deserve the protection of the First Amendment, then, is whether her speech was on a matter of public concern. This inquiry is one of law; therefore, we review the district court's determination de novo. Id., at 148 n.7.

I agree with the majority that to determine whether the speech is on a matter of public concern, the court must examine "the content, form and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. I believe, however, that the majority fails to make this analysis. Rather, it adopts what amounts to almost a per se rule that speech by a public employee about sexual harassment is always protected by the First Amendment. "As a general rule we believe that the topic of sexual harassment of employees by a public official is one `inherently of public concern.'" Maj. op. at 20, quotingConnick, 461 U.S. at 148, n.8. It reaches this result by incorporating several words of Connick dealing with racial discrimination and fusing them with a question of sexual harassment. The majority then stretches this generalization still further to extend First Amendment protection to situations such as Azzaro's, by characterizing her speech as a "report" when it was nothing more than an attempt to seek advice several months after the incident from the Director of Administration on how to keep from becoming a pawn in a political struggle.

We have previously noted that speech is on a matter of public concern when it can fairly be considered as relating to any matter of political, social or other concern to the community. Swineford v. Snyder County, Pa., 15 F.3d 1258, 1270-71 (3d Cir. 1994); Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993). In many situations, discussion of sexual harassment is a matter of community concern and thus implicates the First Amendment. Under some situations, too, discussions of office morale and discipline procedures in the district attorney's office could also be such a matter of public concern. However, in the particular fact situation presented in Connick, the Court found that an employee's speech regarding office morale and discipline was not of public concern. See Connick 461 U.S. at 148, n.8.

The issue is not whether the subject matter could, in other circumstances, be the proper topic of a communication of public concern. The question is whether the content of the communication at hand, in the manner and context in which it was communicated, is a matter of public concern or only of private grievance. See Connick, 461 U.S. at 148-9, n.10; Rankin v. McPherson, 483 U.S. 378 (1987)(employer may not divorce employee's statements from the context in which they were made); Holder v. City of Allentown, supra (whether speech is on a matter of public concern is determined by the context, form and content of the speech). The majority, in attempting to recognize the egregious nature of sexual harassment, has missed this crucial step of the analysis.

In the case at hand, this step demonstrates that Azzaro's communications were not on a matter of public concern. Rather, the context, form and content of her statements supports the conclusion that her speech was on a matter of personal interest

only, precisely what is not protected by the First Amendment. Connick, 461 U.S. at 147.

Azzaro related her alleged experience in Fusaro's office to approximately five or six personal friends at different times at her place of employment within the few weeks following the incident. The chit-chat with these people were not official reports. She never spoke to Sirabella, the official responsible to take action on complaints of sexual harassment, until some months after the alleged incident, and even then, not by way of an official report but to seek advice on keeping her